<u>**REDACTED**</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

<table>
<tr><td></td><td></td><td><u>**UNDER SEAL**</u></td></tr>
<tr><td>UNITED STATES OF AMERICA</td><td>)</td><td>CRIMINAL NO. 2:09cr</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>18 U.S.C. § 371</td></tr>
<tr><td></td><td>)</td><td>Conspiracy</td></tr>
<tr><td>PIOTR BARAVIK,</td><td>)</td><td>(Count One)</td></tr>
<tr><td>(Counts 1, 38, 62, 72)</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>18 U.S.C. § 1546(a)</td></tr>
<tr><td>CHARLES BOND,</td><td>)</td><td>Visa Fraud/Asylum Fraud</td></tr>
<tr><td>(Counts 23, 28, 29)</td><td>)</td><td>(Counts Two - Eighteen)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>SHERYL BROWN,</td><td>)</td><td>8 U.S.C. § 1325(c)</td></tr>
<tr><td>(Count 49, 51)</td><td>)</td><td>Marriage Fraud</td></tr>
<tr><td></td><td>)</td><td>(Counts Nineteen - Twenty-Two)</td></tr>
<tr><td>RYAN BULKLEY,</td><td>)</td><td></td></tr>
<tr><td>(Counts 19, 30, 31)</td><td>)</td><td>18 U.S.C. § 1015(a)</td></tr>
<tr><td></td><td>)</td><td>False Statements Related to</td></tr>
<tr><td>JEKATERINA CEREDNICENKO,</td><td>)</td><td>to Naturalization or</td></tr>
<tr><td>a/k/a "Katrina Bond,"</td><td>)</td><td>Citizenship</td></tr>
<tr><td>(Counts 1, 10, 11, 23-27, 29, 41)</td><td>)</td><td>(Counts Twenty-Three - Thirty-One)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>VIKTORIJA CUDNOVSKA,</td><td>)</td><td>8 U.S.C. § 1519</td></tr>
<tr><td>a/k/a "Victoria Webb,"</td><td>)</td><td>Filing False Documents</td></tr>
<tr><td>(Counts 21, 34)</td><td>)</td><td>(Counts Thirty Two - Thirty-Four)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>MARYIA HALUSHKINA,</td><td>)</td><td>8 U.S.C. § 1324(a)(1)(A)(iv)</td></tr>
<tr><td>(Counts 1, 10, 11, 19, 30,</td><td>)</td><td>Encouraging and Inducing Aliens</td></tr>
<tr><td>31, 38, 41, 50)</td><td>)</td><td>(Counts Thirty-Five - Fifty-One)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>VAHE HARUTYUNYAN,</td><td>)</td><td>8 U.S.C. § 1324(a)(1)(A)(ii)</td></tr>
<tr><td>(Counts 1, 3, 10, 19, 20, 21, 30,</td><td>)</td><td>Transporting Illegal Aliens</td></tr>
<tr><td>31, 38, 41, 50, 61, 63, 74)</td><td>)</td><td>(Counts Fifty-Two - Sixty)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>DZMITRY KRASAUTSAU,</td><td>)</td><td>8 U.S.C. § 1324(a)(1)(A)(iii)</td></tr>
<tr><td>(Counts1, 9-18, 36-52, 56-60, 64-65</td><td>)</td><td>Harboring Illegal Aliens</td></tr>
<tr><td>67-70)</td><td>)</td><td>(Counts Sixty-One - Seventy-Four)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>VIKTAR KRUS,</td><td>)</td><td>18 U.S.C. § 982</td></tr>
<tr><td>(Counts 1, 2, 4-8, 10, 11, 20,</td><td>)</td><td>Criminal Forfeiture</td></tr>
<tr><td>35-37, 40-42, 62, 64, 65, 67-68, 70, 72-73)</td><td>)</td><td></td></tr>
</table>

KATSIARYNA KUKHARCHUK,                )
    (Counts 12, 33)                              )
                                                            )
POLINA KULESH,                                    )
    (Count 13)                                     )
                                                            )
OTIS MARTIN,                                       )
    (Counts 1, 7, 11, 32, 39-42)           )
                                                            )
JANA MIZAKOVA,                               )
    (Count 15)                                     )
                                                            )
ANASTASSIYA NAGIBINA,                  )
    (Count 14)                                     )
                                                            )
INNA PALKOVA,                                 )
    (Count 17)                                     )
                                                            )
PATRICIA POCHTARUK,                     )
    (Counts 1, 10, 11, 18)                    )
                                                            )
KSENIA STEKOLSTSIKOVA,                )
    (Count 22)                                     )
                                                            )
JANOS TAMAS,                                    )
    (Counts 1, 10)                               )
                                                            )
GABOR TEGLASI,                                 )
    (Counts 1, 37-39, 49, 50, 53-55,       )
66, 71)                                                  )
                                                            )
IVAN UKOLOV,                                   )
    (Count 1)                                       )
                                                            )
and                                                       )
                                                            )
DANA WHITNEY,                               )
    (Counts 1, 10, 11)                          )
                                                            )
                    Defendants.        )

## INDICTMENT

January 2009 Term – At Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

### Introductory Allegations

At all times material to all counts of the indictment:

### Defendants

1.  Defendant PIOTR BARAVIK (BARAVIK), a Belarus national,  entered the United States via a J1 visa on June 13, 2003.  BARAVIK later filed for asylum on May 3, 2004, and was granted asylum to stay in the United States as a permanent resident.  BARAVIK performed duties for Harutyunyan such as organizing contracts with the hotels, preparing and delivering paychecks for Vahe's workers.

2.  Defendant CHARLES BOND (BOND), an American citizen, was employed by Viktar Krus.  He engaged in transporting unauthorized aliens.  He entered into a fraudulent marriage with Cerednicenko and was compensated by Krus with a free apartment and a vehicle.

3.  Defendant SHERYL BROWN, a Jamaican citizen, entered the United States on a H2R visa on September 7, 2007.  She encouraged B1 Jamaicans to work here.

4.  Defendant RYAN CURTIS BULKLEY (BULKLEY), an American citizen, entered into a fraudulent  marriage with Mariya Halushkina and she compensated him by paying for his car insurance.

5.  JEKATERINA CEREDNICENKO (CEREDNICENKO), a Latvian national, entered the United States on a J1 student exchange visa  on November 3, 2003 and was the girlfriend of Krus.

CEREDNICENKO entered into a fraudulent marriage on December 21, 2003, with Charles Bond

to obtain permanent status in the United States.  She is the office manager of the Krus

companies.  She keeps track of the hours worked by the illegal aliens at the hotels, prepares

invoices associated with labor expenditures for the hotels, maintains the rent payments and

utilities related to the apartments and houses, and prepares the checks for the individual workers.

6.  Defendant VIKTORIJA CUDNOVSKA (CUDNOVSKA), a Latvian national, entered

the United States on a J1 visa on June 26, 2001.  She entered into a fraudulent marriage with

Joshua Webb on May 24, 2002, to obtain permanent status in the United States.  She was

employed in the "Accounting Department" of Valet Services in 2006.

7.  Defendant MARIYA HALUSHKINA (HALUSHKINA), a Belarus national, entered

the United States on J1 Student exchange Visa on June 17, 2003.   HALUSHKINA entered into a

fraudulent marriage with Ryan Bulkley to obtain permanent status in the United States.

HALUSHKINA performed the same duties as Halushkina when she was out of the country with

Krus.

8.  Defendant VAHE HARUTYUNYAN (HARUTYUNYAN), an Armenian national,

entered the United States on a J1 visa, HARUTYUNYAN later claimed and was granted asylum

in the United States.   HARUTYUNYAN has de facto control of Labor Source Incorporated and

NC Interational.  HARUTYUNYAN has used his companies to also petition for H2B foreign

labor for housekeepers at Tidewater area hotels.  HARUTYUNYAN shares workers,

employment locations, and apartments and houses with Krus.

9.  Defendant DZMITRY KRASAUTSAU (KRASAUTSAU), a Belarus national, entered

 the United States as the spouse of a winner of a diversity visa in March of 2006.

KRASAUTSAU was the second in command of the companies controlled by Krus.  When Krus

was home in Belarus, KRASAUTSAU handles day-to-day operations for the businesses for which he and Krus are the owners or de-facto owners.  KRASAUTSAU has also petitioned to bring H2B housekeepers into the United States, rented apartments which were used as apartments and houses for illegal aliens working and transported illegal aliens from the apartments and houses to their employment locations in the Tidewater area.

10.   Defendant VIKTAR KRUS (KRUS), a Belarus national, entered the United States via a J1 student visa in March of 2001.  KRUS immediately applied for asylum claiming he was persecuted in Belarus for being a member of the ZUBR student group.  KRUS was the registered and/or de facto owner of V&K Services, Hospitality Management Group, Inc., Valet Services, Inc., and Staff Supply Network, Inc.  KRUS used these companies to file fraudulent H2B petitions with the United States Department of Labor to bring foreign born workers into the United States to work as housekeepers, cashiers, fast food workers and materials handlers. VIKTAR KRUS owned, rented or was the de-facto renter of apartments used as residences for illegal alien workers employed by the enterprise's businesses.  Vehicles registered to and purchased by VIKTAR KRUS were used to transport illegal workers employed by the various companies controlled by KRUS.

11.   Defendant KATSIARYRNA KUKHARCHUK (KUKHARCHUK), the girlfriend of Harutyunyan, a Belarus national, entered the United States on a J1 visa on June 15, 2007, which expired on September 1, 2007.  KUKHARCHUK enlisted the help of Krasautsau to help her engage in asylum fraud by falsely claiming she was a member of the ZUBR student group.

12. Defendant POLINA KULESH (KULESH), a Kazakhstan national entered the United States on a J1 student exchange visa on June 10, 2008, which expired on September 2, 2008.  KULESH enlisted Krasautsau to help her file a visa petition to change her status to a B1

tourist visa which allowed her to stay in the United States and illegally work for the Krus companies.

13.   Defendant OTIS MARTIN (MARTIN), an American citizen, was the manager of the Caliber Auto Transport facility in Petersburg, Virginia which signed a labor contract which allowed Krus to periodically submit H2B petitions requesting foreign laborers to fill material handling positions.  MARTIN also submitted a sworn affidavit on behalf of Cerednicenko with the United States Citizenship and Immigration Services (USCIS) stating that Cerednicenko and Bond were in a genuine marriage.

14.   Defendant JANA MIZAKOVA (MIZAKOVA), a Slovakian national, entered the United States on a J1 student exchange visa on May 9, 2008, which expired on September 15, 2008.  She enlisted Krasautsau to help her file a visa petition to change her status to a B1 tourist visa which allowed her to stay in the United States and illegally work.

15.   Defendant ANASTASSIYA NAGIBINA (NAGIBINA), a Kazakhstan national, entered the United States on a J1 student exchange visa on June 10, 2008, which expired on September 2, 2008.  NAGIBINA enlisted Krasautsau to help her file a visa petition to change her status to a B1 tourist visa which allowed her to stay in the United States and illegally work for the Krus companies.

16.   Defendant INNA PALKOVA (PALKOVA), a Russian national, entered the   United States on a J1 visa on July 5, 2008, which expired on October 1, 2008.  PALKOVA enlisted Krasautsau to help her file a visa  petition to change her status to a B1 tourist visa which allowed her to stay in the United States and illegally work for the Krus companies.

17.   Defendant PATRICIA POCHTARUK (POCHTARUK), a United States citizen, born in Chicago, is self-employed and drafted H2B petitions for Krus and then submitted them to

6

an immigration lawyer to then be submitted to the Department of Labor. POCHTARUK diverted a number of these H2B visa recipients to work for companies other than those controlled by Krus in other states, including Florida, Tennessee, Georgia, Alabama and Louisiana.

18. Defendant KSENIA STEKOLSTSIKOVA (STEKOLSTSIKOVA), a Belarus national, entered the United States via a J1 visa on June 5, 2001. STEKOLSTSIKOVA was an early roommate of Krus. STEKOLSTSIKOVA submitted an affidavit to USCIS stating that Krus was a member of the ZUBR movement and was being persecuted by the government. STEKOLSTSIKOVA immediately applied for asylum which was denied. STEKOLSTSIKOVA entered into a fraudulent marriage on October 1, 2003, for the purpose of obtaining permanent residence in the United States. When that marriage ended in divorce, STEKOLSTSIKOVA entered into a second fraudulent marriage on November 4, 2004. When she became separated from her second husband, she fraudulently submitted an asylum petition alleging she had been physically abused by him.

19. Defendant JANOS TAMAS (TAMAS), a Hungarian national, entered the United States via a H2B visa on September 21, 2004. KRUS petitioned for TAMAS to stay in the United States as a H2B housekeeper. TAMAS acted as a regional manager for Krus' businesses, employing alien workers in the Saint Augustine area of Florida. TAMAS rented apartments and houses, transported illegal workers, interacted with hotels who employed the workers and distributed checks to the workers.

20. Defendant GABOR TEGLASI (TEGLASI), a Hungarian national, originally entered the United States via a B2 Tourist Visa on June 13, 2002. On July 7, 2006 he was ordered deported from the United States and remains illegally in the United States. TEGLASI handles

many of the day to day mid-manager requirements of the operation including transporting illegal aliens from the apartments and houses to their employment locations, dropping off checks at the hotels for the workers, and interacting with the full time staff of the hotels to facilitate the H2B workers' employment.

21.  Defendant IVAN UKOLOV (UKOLOV), a Russian national, entered the United States on a J1 visa on June 2, 2004, which expired September 30, 2004.

22.  Defendant DANA WHITNEY (WHITNEY), an American citizen, worked with Pochtaruk to draft labor petitions, illegally divert workers to other states, and coordinate H2B laborers in those states.

### Corporate Entities

23.  V & K Services, Inc. was an organization incorporated by the Commonwealth of Virginia on or about August 18, 2003.  V&K employed J1 student exchange visa holders to fill housekeeper and material handling jobs.  The organization was terminated on January 26, 2005. V & K Services, Inc. was located at 1017 Chinquapin Lane, Apartment 101, Virginia Beach, Virginia 23451.  The Officer/Director and Registered Agent of V & K Services, Inc. was Krus.

24.  Hospitality Management Group, Inc.(HMG) was an organization incorporated by the Commonwealth of Virginia on or about April 12, 2004.   HMG employed J1 student exchange visa holders to fill housekeeper and material handling jobs and later employed H2B visa holders for the same jobs.  The organization was terminated on August 13, 2005.  HMG was located at 304 22nd Street, Virginia Beach, Virginia 23451.  The Registered Agent of HMG was Renato Franceschetti Filho (Filho).  Filho entered the United States on a J1 student exchange visa on December 13, 2003 and departed the United States on April 22, 2004 after his visa expired.

8

25. NC International, Inc. was an organization incorporated by the State of North Carolina on or about May 17, 2005. The principal office of NC International, Inc. was located at 1513 Sir Walter Raleigh Drive, Kill Devil Hills, North Carolina 27948. Other addresses for the corporation were 2709 Campostella Road, Unit 1, Chesapeake, Virginia 23324 and 109 Sea Trace Court, Apartment 101, Virginia Beach, Virginia 23451. The Registered Agent of NC International, Inc. was Julia Malyshko (Malyshko). Malyshko entered the United States on a J1 student exchange visa on June 3, 2004 which expired October 1, 2004. Malyshko never exited the United States and is now an illegal alien.

26. Valet Services, Inc. was an organization incorporated by the Commonwealth of Virginia on or about August 2, 2005. Valet Services, Inc. is located at 508 Birdneck Road, Unit G, Virginia Beach, Virginia 23451. The Sole Proprietor and President of Valet Services, Inc. is Krus.

27. Janitorial Solutions, Inc. was an organization incorporated by the Commonwealth of Virginia on July 17, 2006. The organization was terminated on November 30, 2007. Janitorial Solutions, Inc. was located at 602 20th Street, Apartment A, Virginia Beach, Virginia 23451. The Registered Agent was Olga Federova (Federova). Federova entered the United States via a J1  student exchange visa on May 2, 2006 and returned to Russia on August 31, 2006 after that her visa expired.

28. Staff Supply Network, Inc. was an organization incorporated by the Commonwealth of Virginia on July 17, 2006. The organization was terminated on November 30, 2007. Staff Supply Network, Inc. was located at 602 20th Street, Apartment A, Virginia Beach, Virginia 23451. The Registered Agent was Olga Federova.

29. Quality Cleaning, Inc. was an organization incorporated by the Commonwealth of Virginia on February 23, 2007. The organization was terminated on June 30, 2008. Quality Cleaning, Inc. was located at 419 Barberton Drive, Virginia Beach, Virginia 23451.  The Registered Agent and Director was Anton Zhiraykov (Zhiraykov).   Zhiraykov entered the United States via a J1 student exchange visa on June 10, 2006.  Zhiraykov converted the J1 visa to a B2 tourist visa which expired on October 3, 2007.  Zhiraykov overstayed the visa and is now an illegal alien.

30.  EZ Cleaning, Inc. was an organization incorporated by the Commonwealth of Virginia on February 23, 2007. EZ Cleaning, Inc. was located at 419 Barberton Drive, Virginia Beach, Virginia 23451.  The Registered Agent and Director was Anton Zhiryakov.

31.  Labor Source, Inc. was an organization incorporated by the Commonwealth of Virginia on May 17, 2007.  Labor Source, Inc. was located at 97 Crater Woods Court, Petersburg, Virginia 23805.  The registered Agent and Director was Sergy Chernenko (Chernenko).  Chernenko entered the United States via a H2B visa on January  30, 2007 and departed for Helsinki Finland on May 16, 2008.

32.  Tidewater Personnel Management LLC. was an entity established in June 2008 and located at 629 Piney Branch Drive, Apartment 103, Virginia beach, Virginia 23451.  This entity has not filed Articles of Incorporation with the Commonwealth of Virginia.  Krasautsau is the only individual associated with this entity.

## H2B Visa Petitioning Process

33.  Under United States laws and regulations, non-citizens of the United States ("aliens") are not permitted to work in the United States unless they obtain employment authorization from the United States Government.

a.  Aliens living outside of the United States can apply for a non-immigrant visa referred to as an H-2B visa. The H-2B visa permits aliens to work in the United States for a specified, temporary period of time.

b.  An employer seeking to employ temporary foreign employees was required to use a process involving at least three steps and at least three government entities: a state labor agency, the United States Department of Labor ("DOL"), and the United States Department of Homeland Security, Citizenship and Immigration Services ("CIS").

aa.  The state workforce agency in Florida is the Agency for Workforce Innovation (AWI).

bb.  The state workforce agency in Virginia is the Virginia Employment Commission (VEC) .

34.  A prospective employer is required to file a DOL Application for Alien Employment Certification ("ETA-750") with the state labor agency, for example, AWI. The application sets forth the name of the employer, the address of the employer and where the aliens will work, the job being offered, the rate of pay, the qualifications required of the prospective alien employee, the number of openings to be filled by aliens and dates of expected employment. The employer must also describe in detail efforts to recruit qualified United States workers for the job opportunity and the results of those efforts. The ETA-750 application must be completed and signed under penalty of perjury by the prospective employer. The state labor agency reviews the ETA-750 for completeness, ensures that the employer is offering the prevailing wage for the job listed in the ETA-750, and oversees any advertising the employer might be required to do as part of the labor certification process.  After the ETA-750 is reviewed by the state labor agency, it is

forwarded to DOL for consideration and certification. If DOL certifies the ETA-750, then DOL issues the certified ETA-750 with an original stamped certification that contains the signature of the certifying DOL officer. The DOL officer also issues the prospective employer a "Final Determination Letter," which notifies the employer that the request for temporary foreign workers has been certified based upon the ETA-750 and the supporting documentation.

35.  Once DOL issues the prospective employer a certified ETA-750, the employer is required to submit the original ETA-750, along with a Petition for Non-Immigrant Worker ("I-129") to CIS. The I-129 petition must be completed and signed under penalty of perjury by the prospective employer. In the I-129 petition, the employer represents that there is a specific job to fill and describes the nature, location, terms, and requirements of the job.

36.  If USCIS approves the I-129 petition, a USCIS employee notes the approval on the original I-129 petition, and designates the number of H-2B temporary foreign worker positions approved on the I-129. The prospective employer is notified by letter that the I-129 petition has been approved. If USCIS approves the I-129 petition, USCIS generates a Notice of Action ("I-797") and a copy is sent to the employer and the appropriate United States Embassy.

37.  Aliens seeking to enter the United States as a H-2B temporary workers are required to complete an Application for a Nonimmigrant Visa ("DS-156"). The alien must submit the DS-156 form to the United States Embassy or United States Consulate in the country from which they are applying.

38.  Once the appropriate United States Embassy or Consulate receives the approved I-797 from USCIS, the United States Department of State issues H-2B visas to qualified aliens.

39.  Once an alien receives an H-2B visa, the alien is permitted to apply for entry into the United States and work only for the petitioning employer.  The alien is not authorized to work for any other employer and only at the location specified in the petition.

**Petition for Alien Relative**

40.  Aliens who wish to become lawful permanent residents of the United States and eventually become naturalized United States citizens may avoid the numerical restrictions on the number of immigrants allowed in the United States, as well as certain visa and other requirements imposed by the law, by becoming the spouse of a United States citizen.

41.  A United States citizen may petition the government of the United States to grant an alien spouse lawful permanent resident status without regard to the numerical restrictions noted previously by filling out a Form I-130 (Petition for Alien Relative).

42.  An approved immediate relative visa petition allows an alien spouse to file a Form I-485 (Application to Register Permanent Resident or Adjust Status) requesting that the United States Government adjust the alien spouse's status to that of a lawful permanent resident without the alien having to leave the United States.  If the alien cannot adjust status this way, the alien must leave the United States, obtain an immigrant visa at a United States embassy in the alien's home country, and reenter the United States.

43.  Forms I-130 and I-485 are typically filed together and the visa petition and adjustment application are adjudicated at the same time.  In support of these applications, the United States citizen spouse and the alien spouse each submit Biographic Information forms (Form G-325A) containing biographic information.

44.  Once the I-130 and I-485 are accepted by USCIS a formal interview is scheduled with both the United States Citizen and their foreign born spouse to determine if the marriage is genuine.   Documentation is commonly submitted in support of the marriage including sworn affidavits by friends and family.   Both spouses are placed under oath by the USCIS adjudicator and then asked a series of questions to determine if the marriage is legitimate or if the marriage has been entered into for the purpose of evading the immigration laws.

45.  Title 8, United States Code, Section 1325(c) provides that it is a crime to "knowingly enter into a marriage for the purpose of evading any provision of the immigration  laws."

## Count One

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

## At all times material to this criminal indictment

2.  The Department of Labor (DOL) is responsible for administrating, regulating and enforcing the provisions of 20 CFR Part 655, Subpart A, which governs the labor certification process for temporary employment of aliens in the United States under the H2B classification and requires that the Certifying Officer of the Employment and Training Administration (ETA) issue temporary labor certifications on behalf of the Secretary of Labor.   DOL adjudicates all petitions for temporary foreign workers to fulfill seasonal or peak need jobs that could not be filled by United States Citizens.  An H2B temporary labor certification is advisory to USCIS and where the employer is notified by the DOL that certification is denied or cannot be made, the

employer may submit countervailing evidence, according to 8 CFR Part 214.2(h) directly to USCIS.

3.    United States Citizenship and Immigration Services (USCIS) is the government agency that oversees lawful immigration to the United States.  USCIS adjudicates the petitions and applications of potential immigrants and is therefore responsible for administrating, regulating enforcing the various visa programs, petitions and applications available to aliens desiring to come to or currently in the United States, including the H2B temporary non-agricultural worker visa, the B2 temporary visitor for pleasure visa, the J1 exchange visitor visa, the Form I-130 Petition for Alien Relative, and the Form I-539 Application to Extend/ Change Nonimmigrant Status.

4.   The Department of Homeland Security Immigration and Customs Enforcement (ICE) is responsible for enforcing federal criminal statutes, including Title 8, United States Code, § 1324(a) relating to transporting, harboring and encouraging and inducing illegal aliens.

## The Conspiracy and Its Objects

5.   From the period in or about March 2001 and continuing through the date of this indictment, in the Eastern District of Virginia and elsewhere, the defendants, PIOTR BARAVIK, JEKATERINA CEREDNICENKO, MARYIA HALUSHKINA, VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, OTIS MARTIN, PATRICIA POCHTARUK, JANOS TAMAS, GABOR TEGLASI, , IVAN UKOLOV, DANA WHITNEY and others both known and unknown to the Grand Jury, knowingly and unlawfully combined, conspired, and agreed together and with other persons to:

15

a. defraud the United States of America concerning one or more of its lawful government functions and rights hereafter described, that is;

aa.  To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of the DOL to administer, regulate and enforce the regulations and laws relating to the implementation of the H2B non-immigrant visa program.

bb.  To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of USCIS to administer, regulate and enforce the regulations and laws related to the hiring, employment and presence of aliens in nonimmigrant status and immigrant status in the United States.

cc.  To defraud the United States by impeding, impairing, and obstructing the lawful governmental functions of ICE  to regulate and enforce violations, regulations and laws relating to transporting, harboring and encouraging and inducing illegal aliens.

b.  commit one or more of the following offenses, that is:

aa.  To make under oath, and as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, and to knowingly subscribe as true, false statements with respect to a material fact in applications, affidavits and other documents required by the immigration laws and regulations prescribed thereunder, and to knowingly present such applications, affidavits and other documents containing false statements, in violation of Title 18, United States Code, Section 1546(a);

bb.  To transport and move said aliens within the United States by means of transportation and otherwise in furtherance of such violation of law for the purpose of

16

commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii);

       cc.  To conceal, harbor and shield from detection such alien in buildings and other places for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii);

       dd. To encourage and induce aliens to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

### Ways, Manners, and Means of the Conspiracy

  6.  It was part of the conspiracy that the defendants would by deceit, craft, trickery and dishonest means, defraud the United States by interfering and obstructing the lawful government functions of the DOL, USCIS, and ICE in that the defendants would engage in the following behavior:

  7.  The defendants PIOTR BARAVIK, JEKATERINA CEREDNICENKO, MARYIA HALUSHKINA, VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, OTIS MARTIN, PATRICIA POCHTARUK, JANOS TAMAS, GABOR TEGLASI, IVAN UKOLOV, DANA WHITNEY unjustly enriched themselves by preparing and submitting fraudulent ETA-750 applications, fraudulent I-129 petitions, and related applications to the United States Government which lead to the defendants establishing a permanent foreign labor pool which could be employed across the United States in jobs that normally would have been filled by United States Citizens.

8.   The defendants fraudulently obtained and attempted to obtain permanent residence in the United States by filing false alien relative petitions, false asylum petitions, and false tourist visa requests, or unlawfully staying in the United States.

9.    The defendants and others, submitted the ETA-750 applications to the appropriate state workforce agency ("SWA") .  In the submitted ETA-750 applications, one or more of the co-conspirators secured a fraudulent labor contract with employees of various hotels and intermodal transportation companies located in Virginia and Florida.

10.  The ETA-750 applications were fraudulent and contained falsehoods, including (1) false assertions that the job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law, (2) false assertions that the aliens would be placed on the payroll on or before the date of the alien's proposed entrance into the United States, (3) false assertions that the job opportunity has been clearly open to any qualified U.S. worker, (4) false assertions that the wage offer is not based on commissions (5) false statements about the location where the aliens will work, (6) false statements concerning the peak or seasonal need for alien labor, and  (7) false statements about the number of jobs listed in the application based on the service provider agreements.

11.   It was further part of the conspiracy that the defendants PIOTR BARAVIK, VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, GABOR TEGLASI, and others negotiated with employees of the client companies who were not authorized to sign service provider agreements. The agreements contained falsehoods, including the client companies amount of actual need to hire temporary workers as housekeepers during the seasonal tourist season. The letters contained the signature block and signature of one or more of the

18

co-conspirators and signatures of persons not authorized to sign as  representatives of the hotels.

The letters were submitted to the state workforce agency as supporting documentation to the

ETA-750.   For example, as part of the package for ETA A-08009-33983, OTIS MARTIN

signed a service provider agreement with VIKTAR KRUS for client company Caliber Auto

Transfer for 93 materials handling jobs during a fraudulently created peak period when OTIS

MARTIN and VIKTAR KRUS knew the Peterburg Auto Terminal had work for only five to

twelve workers during the period maximum need which was permanent and not peak or

seasonal.

12.  It was further part of the conspiracy that the defendants VIKTAR KRUS, DZMITRY

KRASAUTSAU, JEKATERINA CEREDNICENKO, MARIYA HALUSHKINA, JANOS

TAMAS and others placed advertisements for housekeeping jobs in newspapers. The state

workforce agency and the DOL require employers to attempt to find qualified United States

workers to fill vacant jobs before certifying foreign workers.

13.  It was further part of the conspiracy that the defendants VIKTAR KRUS, DZMITRY

KRASAUTSAU, JEKATERINA CEREDNICENKO, JANOS TOMAS and others would not

contact or would actively dissuade United States Citizens who applied for the housekeeping

jobs.  The defendants would then certify to the state workforce agency that the United States

Citizens did not wish to perform the job duties or could not be contacted by the defendants

during the period when the job was open.

14.  It was further part of the conspiracy that after the DOL certified the ETA-750

applications, the defendants VIKTAR KRUS, DZMITRY KRASAUTSAU, JEKATERINA

CEREDNICENKO, PATRICIA POCHTARUK, DANA WHITNEY and others prepared and

submitted I-129 petitions to CIS. These I-129 petitions were based upon the fraudulently

obtained DOL labor certifications. The I-129 petitions submitted to CIS contained falsehoods,

including false assertions that the defendants had valid labor agreements to service temporary

peak or seasonal  needs with the hotels listed in the petitions.

15.  It was further part of the conspiracy that the defendants PIOTR BARAVIK, VAHE

HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, PATRICIA POCHTARUK,

JANOS TOMAS, DANA WHITNEY, and others would broker the impending H2B visa

recipients to other co-conspirators in other states, including Florida, Alabama, Tennessee, and

Louisiana to be employed in positions which had not been not approved by either DOL or CIS.

For example, defendant PATRICIA POCHTARUK took the majority of workers on ETA

petition A-08008-33837 which authorized Valet Services to bring 185 foreign workers into the

United States to work in the Virginia Hampton Roads area as housekeepers for the Doubletree

Hotel, 1900 Pavilion Drive, Virginia Beach; the Doubletree Hotel Norfolk Airport, 880 N.

Military Highway, Norfolk, the Renaissance Portsmouth Hotel,425 Water Street, Portsmouth,

Virginia; and the Embassy Suites Hampton Roads, 1700 Coliseum Drive, Hampton, Virginia;

and diverted those alien workers to housekeeping positions in Florida and Tennessee, cashiers in

Louisiana, fast food workers for Sonic in Alabama, and fast food workers for Wendys in

Louisiana.

16.  It was further part of the conspiracy that co-conspirators would instruct the foreign

laborers that during their interview at the United States Embassy, the laborers were to lie and tell

the embassy staff that they were going to fill the job specifically authorized by the DOL when

the laborer knew they were being sent to another job in another state.

17. Following the approval of the I-129 petitions by CIS, aliens came to the United States and worked for various hotels as contract employees for companies controlled by VIKTAR KRUS, or worked for various for hotels or restaurants as contract employees of co-conspirators in states other than Virginia based on fraudulent non-immigrant visa applications.

18. It was further part of the conspiracy that the defendants MARIYA HALUSHKINA, DZMITRY KRASAUTSAU, VIKTAR KRUS, PATRICIA POCHTARUK, DANA WHITNEY, and others transferred money and faked payroll records to make it appear as if the company that actually petitioned for the workers with DOL was the company paying the workers, even when those workers were actually being employed in states and jobs not approved by DOL.

19. It was further part of the conspiracy that the defendants JEKATERINA CEREDNICENKO, MARIYA HALUSHKINA, DZMITRY KRASAUTSAU, VIKTAR KRUS, PATRICIA POCHTARUK, and others used multiple companies to allow H2B visa recipients to stay in the United States permanently. The defendants would use a different company on successive petitions to create the illusion that another, independent company had a seasonal or peak need which could be filled by prior H2B recipients whose visas were expiring on the previous petition by the first company. For example, in 2008, Krus applied for 185 housekeepers for the Virginia Beach area using his company, Valet Services. At the time the visas held by these aliens were expiring in January 2009, VIKTAR KRUS applied for 195 housekeepers using Janitorial Services as the new petitioning company. Meanwhile, other co-conspirators including DZMITRY KRASAUTSAU told these alien workers that they could extend on the new petition.

21

20. In was further part of the conspiracy that the defendants VIKTAR KRUS, DZMITRY KRASAUTSAU, GABOR TEGLASI , JEKATERINA CEREDNICENKO, MARIYA HALUSHKINA, PATRICIA POCHTARUK, DANA WHITNEY , JANOS TOMAS and others would charge the current H2B receipts several hundred dollars so they could be migrated (extended) onto a successive H2B visa petition.

21. It was further part of the conspiracy for the defendants VIKTAR KRUS , DZMITRY KRASAUTSAU, GABOR TEGLASI, JEKATERINA CEREDNICENKO, MARIYA HALUSHKINA, JANOS TOMAS and others also to employ other illegal aliens such as J1 exchange students who overstayed their visas, B2 tourist visa holders, and H2B workers who overstayed their visas in order to supplement the workers who were entering the United States via  the defendants' fraudulent labor petitions.

22. It was further part of the conspiracy for the defendants VIKTAR KRUS, DZMITRY KRASAUTSAU , GABOR TEGLASI, VAHE HARUTYUNYAN, JANOS TOMAS, PIOTR BARAVIK, R.K., S.B., A.A. and others to provide the unauthorized aliens with transportation by automobile or truck from the airport to the defendants' business offices and to the apartment or house where the alien would be residing while employed.  The defendants would also provide transportation for the unauthorized aliens from a prior residence to another residence if the alien changed employment or requested to live at another residence.

23. It was further part of the conspiracy for the defendants PIOTR BARAVIK, JEKATERINA CEREDNICENKO, a/k/a "Katrina Bond,"  VIKTORIJA CUDNOVSKA, MARIYA HALUSHKINA, VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, JANOS TAMAS, GABOR TEGLASI, and others to provide housing to the

unauthorized aliens to whom they had also provided employment.  Such housing consisted of apartments and houses that were either owned or leased by the defendants in their own name or in the name of a nominee. The defendants or a nominee would thereafter pay the rent or mortgage for the residence as well as the utilities. The housing was typically located near the places of employment the defendant offered the unauthorized aliens so as to make it more convenient for the aliens to get to their jobs.

24.  It was further part of the conspiracy for the defendants  PIOTR BARAVIK, JEKATERINA CEREDNICENKO,  MARIYA HALUSHKINA, VAHE HARUTYUNYAN, VIKTAR KRUS, DZMITRY KRASAUTSAU, GABOR TEGLASI, and others would charge the unauthorized aliens rent for living in the housing provided by the defendants.  Defendants would typically deduct such rent for the housing provided to them  from the paychecks of the unauthorized alien employees.

25.  It was further part of the conspiracy for the defendants VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, PATRICIA POCHTARUK, DANA WHITNEY and others used recruiters including SHERYL BROWN to seek out workers in foreign countries and to have them enter into the United States on B2 tourist visas and thereafter unlawfully provide them employment with corporations controlled by VIKTAR KRUS to fulfill contracts they established with businesses in the Eastern District of Virginia and elsewhere.

26.  It was further part of the conspiracy for the defendants VAHE HARUTYUNYAN, DZMITRY KRASAUTSAU, VIKTAR KRUS, GABOR TEGLASI, JANOS TOMAS, IVAN UKOLOV and others to recruit J-1 student visa holders to work for their corporations lawfully,

and thereafter, upon the expiration of their J-1 visas, encouraged and induced the student visa

holders to overstay their visas and to continue working without legal authorization.

27.  It was further part of the conspiracy for the defendants DZMITRY

KRASAUTSAU, VIKTAR KRUS, and others to encourage aliens on expiring visas such as

POLINA KULESH, JANA MIZAKOVA, ANASTASSIYA NAGIBINA, INNA PALKOVA,

an others to obtain B-2 visas and to continue working for defendants, knowing that employing

such aliens in that visa status was illegal.

28.  It was further part of the conspiracy for the defendants VAHE HARUTYUNYAN,

DZMITRY KRASAUTSAU, VIKTAR KRUS,  S.B., R.K. and others to ensure that these

unauthorized alien workers were picked up at the airport or bus terminal when they arrived at

the location they were to be employed and would provide housing for them at location close the

their respective employment.

29.  It was further part of the conspiracy for the defendants DZMITRY KRASAUTSAU,

KSENIA STEKOLSTSIKOVA, and others to construct or translate false supporting documents

for the fraudulent Applications for Asylum and for Withholding Removal (Form 1-589) of

VIKTAR KRUS and KATSIARYNA KUKHARCHUK which were submitted to USCIS or to

immigration judges.

30.  It was further part of the conspiracy for the defendants VIKTORIJA CUDNOVSKA,

VIKTAR KRUS, OTIS MARTIN, and others to construct or submit false documentation in

support of fraudulent petitions of an alien relative for JEKATERINA CEREDNICENKO,

CHARLES BOND, MARIYA HALUSHKINA, and RYAN CURTIS BULKLEY, to USCIS.

31.  It was further part of the conspiracy for the defendants DZMITRY KRASAUTSAU, VIKTAR KRUS, and others to provide funds for legal representation of conspirators who were arrested for federal violations including Valeryia Tsymbal.

32.  It was further part of the conspiracy for others including separately indicted co-conspirator Tatsiana Smuraha to tamper with government witnesses or obstruct justice in an effort to disrupt federal prosecutions of conspirators for immigration related crimes.

33.  It was further part of the conspiracy for other co-conspirators to attend federal court proceedings of previously indicted co-conspirators and immediately thereafter contact VIKTAR KRUS in Belarus to inform him of federal sentences imposed those co-conspirators who were convicted.

## OVERT ACTS

In furtherance of this conspiracy one or more of the following acts were committed in the Eastern District of Virginia and elsewhere:

1.  In or about March 2001, KRUS received a J1- student exchange visa which was valid from April 2, 2001 until September 20, 2001.

2.  On or about March 28, 2002, KRUS filed an I-589 Application for Asylum and for Withholding of Removal.

3.  In or about June 2001, CUDNOVSKA received a J1 - student exchange visa which was valid from June 26, 2001 until October 19, 2001.

4.  On or about April 29, 2002, STEKOLSTSIKOVA filed an I-589 Application for Asylum and for Withholding of Removal.  On the I-589, STEKOLSTSIKOVA listed her current address as ███████████████████████ Virginia Beach, Virginia.  In her affidavit for

25

asylum, STEKOLSTSIKOVA applied for religious asylum from Estonia, stating that she had lived in Estonia her entire life but was unable to return to Estonia after the USSR crumble. STEKOLSTSIKOVA further stated that she was Pentecostal and that she and her family were harassed and her father was beaten due to her religion.

5.  On or about May 24, 2002, in Virginia Beach, CUDNOVSKA and an unindicted co-conspirator J.W. entered into a marriage performed by a Marriage Commissioner at the Virginia Beach Circuit Court for the purpose of providing CUDNOVSKA with permanent status in the United States.

6.  On or about June 17, 2003, HALUSHKINA entered the United States via a J1 student exchange visa which was set to expire October 8, 2003.

7.  In or about the summer of 2003, HALUSHKINA told BULKLEY that she needed to get married to stay in the country because her student visa was going to expire.   HALUSHKINA told BULKLEY, "All we have to do is go to the courthouse, sign papers, and stay married for two years.  HALUSHKINA offered BULKLEY $5,000 if he would marry her."

8.  In or about October 2002, KRUS and TEGLASI employed illegal aliens in St. Louis using the company name V & K Services contracting with Caliber Auto Transfer.

9.  On or about October 24, 2003, in Saint Louis Missouri, KRUS paid $15,000 for an immigration bond for TEGLASI.   KRUS listed an address of ███████████████

10.  On or about November 1, 2003, CEREDNICENKO entered the United States via a J1 - student exchange visa which was set to expire in June of 2004.

11.  On or about December 21, 2003, in Virginia Beach, Virginia,  CEREDNICENKO and BOND entered into a marriage performed by a Marriage Commissioner in the Virginia

Beach Circuit Court for the purpose of providing CEREDNICENKO with permanent status in the United States.

12.  On or about August 30, 2004, in Virginia Beach, Virginia, HALUSHKINA and BULKLEY were married by a Marriage Commissioner at the Virginia Beach Circuit Court for the purpose of providing HALUSHKINA with permanent status in the United States.

13.  On or about November 4, 2004, in Virginia Beach, Virginia, STEKOLSTSIKOVA and unindicted co-conspirator E. A. were married by a Marriage Commissioner in the Virginia Beach Circuit Court for the purpose of providing STEKOLSTSIKOVA with permanent status in the United States.

14.  In or about the winter of 2005 a confidential informant (CI1) contacted an employment agency in Anotto Bay Jamaica that promised work in the United States if CI1 possessed a valid B2 tourist visa.  CI1 paid $550.00 to get the number of a contact of an employer that would give her a job.  In or about the winter of 2005, CI1 called KRUS and spoke to KRUS about starting a job in the United States.  KRUS told CI1 to call when she reached Virginia Beach.

15.  On March 9, 2005, KRUS purchased ███████████████████ Virginia Beach, Virginia, for $243,000.

16.  On or about March 21, 2005, in Virginia Beach, Virginia separately indicted co-conspirators Jeremy Emrick and Valeryia Tysmbal entered into a fraudulent marriage for the purpose of evading provisions of the immigration laws.

17.  On or about April 2005, in Norfolk Virginia, CI1 traveled from New York to Virginia Beach for the purpose of working for KRUS.

18.  In or about April 2005, in Norfolk Virginia, TEGLASI picked up CI1 from the bus stop and drove her to ██████████████████ Virginia Beach, Virginia where she was to stay while working for KRUS.

19.  In or about April 2005, KRUS told CI1 that her rent would be deducted from her paycheck and she would have to pay for her food.

20.  In or about May 2005, TEGLASI told CI1 that he married "A nasty fat, American woman, so he could get his papers."

21.  On about June 3, 2005, TEGLASI transported CI1, who was in the United States on a B2 tourist visa, to work at a local area hotel and was involved in an auto accident in which CI1 was injured.

22.  On or about June 4, 2005, KRUS told CI1 that she should take painkillers and go to work when CI1 told KRUS she was unable to work due to her injures.   KRUS screamed at CI1 and ordered her to leave the apartment he provided for her and when the other workers stood up for CI1, KRUS thereafter fired all of them.

23.  On or about June 17, 2005, in Virginia Beach, Virginia, KRUS filled out an I-864 Affidavit of Support under Section 213A of the Immigration Act on behalf of HALUSHKINA. KRUS stated he was employed at HMG with an annual salary of $72,000 and possessed an asylum approval petition.  This application was subsequently turned down because KRUS was not a permanent resident.

24.  On or about July 11, 2005, in Norfolk, Virginia, CEREDNICENKO and BOND appeared for their interview with USCIS in Norfolk, Virginia, and during that interview CEREDNICENKO and BOND, while under oath, gave false answers to the USCIS interviewing

officer to make the marriage appear legitimate.  During that interview CEREDNICENKO

claimed to reside at a residence owned by "Victor Crews" or "Victor Cruz" and she did not

know the spelling.

25.  On or about August 19, 2005, in Virginia Beach, Virginia, HALUSHKINA and

BULKLEY practiced the fraudulent answers they intended to give USCIS during the interview

the following day including their explanation of why they lived in different cities.

26.  On or about August 20, 2005, in Norfolk, Virginia, HALUSHKINA and BULKLEY

arrived for their interview with USCIS in separate cars and met in an adjacent parking lot before

entering the address for USCIS.

27.  On or about August 20, 2005, in Norfolk, Virginia HALUSHKINA  and BULKLEY

appeared for their interview with USCIS in Norfolk, Virginia, and during that interview

HALUSHKINA and BULKLEY, while under oath, gave false answers to the USCIS

interviewing officer to make the marriage appear legitimate.   HALUSHKINA paid BULKLEY

$200 for the money BULKLEY lost by missing work for the interview.

28.  On or about July 30,  2005, in Virginia Beach, Virginia, CUDNOVSKA filled

out an I-864 Affidavit of Support under Section 213A of the Immigration Act on behalf of

HALUSHKINA.

29.  On or about August 2, 2005, in Virginia Beach, Virginia, Valet Services was

incorporated, listing KRUS as President with a listed address of ████████████Virginia

Beach, Virginia.

30.  On or about September 8, 2005, in Virginia Beach, Virginia, HMG, Inc. was

terminated by the Virginia State Corporation Commission.

31.  On or about October, 2005, in Norfolk, Virginia, STEKOLSTSIKOVA  and E.A. appeared for their interview with USCIS in Norfolk, Virginia.  Afterwards, their petition was denied due to the fact that STEKOLSTSIKOVA was still legally married to another United States citizen.

32.  On or about October 20, 2005, KRUS submitted Form ETA 750 to the Virginia Employment Commission (VEC) , requesting that 70 unnamed alien workers be issued H2B visas for the period from 12/01/2005 to 09/30/2006 on behalf of HMG Services, Inc. to perform work as "Motor Vehicle Operators" at Caliber Auto Transfer Terminals, Virginia Beach, Virginia, namely, to "Drive an automobile from one area to another inside the terminal and drive the automobile onto the loading ramp.  Valid driver's license required."  An employer contract signed by Adrian Manero, General Manager, Caliber Auto Transfer Terminals on October 14, 2005, accompanied the ETA 750.

33.  On or about February 19, 2006, CEREDNICENKO registered a BMW sedan, license plate KBM 4030, to Valet Services Inc., Chesapeake, Virginia.

34.  On or about March 14, 2006, J.M. submitted Form ETA 750 to the VEC requesting that 93 unnamed alien workers be issued H2B visas for the period 04/15/2006 to 11/15/2006 on behalf of NC International, Inc., to perform work as "Housekeeper" at 3001 Atlantic Avenue and other selected hotels in Virginia Beach, Virginia, namely, to "Maintain order and cleanliness in lodging facilities."  An employer contract signed by the Managing Agent for Professional Hospitality Resources, Inc. (PHR) and Julio Malyshko on March 2, 2006, accompanied the ETA 750.

35.  On or about April 18, 2006, CUDNOVSKA Completed a verification of employment form listing herself as the officer manager for Valet Services Inc. and BARAVIK as her manager.

36.  On or about May 8, 2006, KRUS executed a deed transfer and took possession of ▮▮▮▮▮▮▮▮▮Virginia Beach, Virginia.

37.  On or about July 17, 2006, in Virginia Beach, Virginia, Staff Supply Network and Janitorial Solutions were incorporated both listing Olga Federova as the registered agent located at 602 20th Street, Apt. A.

38.  On or about August 2, 2006, KRUS submitted Form ETA 750 to the VEC requesting that 60 unnamed alien workers be issued H2B visas for the period from 12/01/2006 to 09/30/2007 on behalf of HMG Services, Inc., to perform work as "Banquet/Dining Room Attendant" at Portsmouth Hotel, Portsmouth, Virginia, namely, to "Facilitate food service, clean tables, carry dirty dishes, replace soiled linens, set tables, replenish supply of clean linens, silverware, glassware and dishes."  An employer contract signed by Jennifer Pierce, Portsmouth Hotel and KRUS on July 19, 2006, accompanied the ETA 750.

39.  On or about August 2, 2006, KRUS submitted Form ETA 750 to the VEC requesting that 35 unnamed alien workers be issued H2B visas for the period from 12/01/2006 to 09/30/2007 on behalf of HMG Services, Inc., to perform work as "Housekeeper" at Portsmouth Hotel, Portsmouth, Virginia, namely, to "Clean and maintain premises, deliver ironing boards, cribs, and roll-away beds to guests' rooms."  An employer contract signed by Crystal Talley, Portsmouth Hotel and KRUS on July 19, 2006, accompanied the ETA 750.

40.  On or about August 2, 2006, KRUS submitted Form ETA 750 to the VEC requesting that 30 unnamed alien workers be issued H2B visas for the period from 12/01/2006 to

09/30/2007 on behalf of HMG Services, Inc., to perform work as "Food Server" at Portsmouth

Hotel, Portsmouth, Virginia, namely, to "Take food orders and serve food and beverages to

patrons in hotel dining facilities."   An employer contract signed with an illegible signature on

behalf of Portsmouth Hotel and KRUS on July 19, 2005, accompanied the ETA 750.

41.  On or about August 4, 2006, TEGLASI executed a lease at ███████████

███████████.  TEGLASI reported being employed by H.M.G. Services.

42.  On about August 14, 2006, an unindicted co-conspirator (D.H.) executed a lease at

██████████████████████████using income documents listing his employment at

HMG Services and listing a point of contact as TEGLASI.

43.  On or about November 11, 2006, KRASAUTSAU listed himself as the Assistant

Manager of HMG Services, Inc., located at 1833 Haviland Drive, Virginia Beach, Virginia

23454.

44.  On or about January 26, 2007, KRUS obtained an assumed name certificate for Valet

Service, Inc. located at 2721 Rex Lane, Virginia Beach, Virginia 23456 in the name of Staffing

VS located at 508 Birdneck Road, Unit G, Virginia Beach, Virginia 23451.

45.  On or about February 23, 2007, Labor Source, Inc. was incorporated, listing

unindicted co-conspirator A.Z. as the registered agent with a place of business as 419 Barberton

Drive, Virginia Beach, Virginia.

46.  On or about March 16, 2007, KRUS submitted Form ETA 750 to the VEC

requesting that 25 unnamed alien workers be issued H2B visas for the period from 05/30/07 to

12/31/07 on behalf of Valet Services, Inc., to perform work as "Loader" at Chesapeake Auto

Terminal, Chesapeake, Virginia, namely, to "Take verbal instructions to understand work

assignments, clean the yard, vehicles and parking lots, pick up trash, wrap protective materials along the

vehicle's front and rear bumpers, and inspect vehicles for physical damage."  An employer contract signed by MARTIN, General Manager, Caliber Auto Transport, on January 11, 2007, accompanied the ETA 750.

47.  On or about March 22, 2007, BOND and CEREDNICENKO submitted a package to USCIS containing staged photographs and documentary material in an effort to convince USCIS that they were in a bonafide marriage.

48.  On or about April 2, 2007, KRUS submitted Form ETA 750 to the VEC requesting that 22 unnamed alien workers be issued H2B visas for the period from 05/15/07 to 01/10/08 on behalf of Valet Services, Inc., to perform work as "Housekeeper" at the Hilton Garden Inn, Virginia Beach, Virginia,  namely, to "Clean rooms, lobbies, restrooms, corridors, etc; Dust and polish furniture and equipment; empty and clean ash trays and wastebaskets."  An employer contract signed by Robert Murphy, Assistant General Manager, Hilton Garden Inn, on February 15, 2007, accompanied the ETA 750.

49.  On or about May 17, 2007, in Virginia Beach, Virginia, Labor Source, Inc. was incorporated listing a business address of 97 Crater Woods, Petersburg, Virginia with a registered agent of unindicted co-conspirator S.C. who was employed by Valet Services Inc. at that time.

50.  On or about May 21, 2007, Baravik listed on his G-325 Biographic Information Sheet that he was a manager for Valet Services located at 2709 Campostella Road, Chesapeake from September 2005 until May 21, 2007.

51.  On June 6, 2007, CI1 entered the United States via a B2 tourist visa to work for HARUTYUNYAN.

52.  In or about June 2007, HARUTYUNYAN employed CI1 at the Virginia Beach Resort and Conference Center.

53.  On or about July 20, 2007,  KRASAUTSAU submitted Form ETA 750 to the VEC requesting that 185 unnamed alien workers be issued H2B visas for the period from 11/15/07 to 09/01/08 on behalf of Janitorial Services, Inc. to perform work as "Housekeeper" at Double Tree Hotel, Virginia Beach, Renaissance Portsmouth Hotel, Portsmouth, and Embassy Suites, Hampton, Virginia, namely, to "Keep hotel premises clean and orderly condition, clean floors, shampoo rugs, wash walls and windows, and remove rubbish, clean guest rooms, make beds, replenish linens and vacuum."  Employer contracts signed by Carrie Clark, Executive Housekeeper, Double Tree Hotel, June 26, 2007, and by Dawn Ward, Renaissance Portsmouth Hotel, and the Assistant General Manager (signature illegible), Executive Suites on June 27, 2007, along with the signature of KRASAUTSAU accompanied the ETA 750.

54.  On August 1, 2007, in Norfolk, Virginia CEREDNICENKO and BOND appeared for their interview with USCIS in Norfolk, Virginia, and during that interview CEREDNICENKO and BOND, while under oath, gave false answers to the USCIS interviewing officer to make the marriage appear legitimate.  Both stated during the interview that they lived at ██████████ ██████ which was owned by KRUS.

55.  On or about August 1, 2007, in Virginia Beach, Virginia, after the immigration interview BOND drove to 508 Birdneck Road, Unit G and dropped off CEREDNICENKO then returned to his actual residence at ████████████████████ after the interview.

34

56.  On or about August 1, 2007, CUDNOVSKA and CEREDNICENKO drove away from Birdneck Road, Unit G.

57.  On August 16, 2007, in Norfolk, Virginia HALUSHKINA  and BULKLEY appeared for their interview with USCIS in Norfolk, Virginia, and during that interview HALUSHKINA and BULKLEY, while under oath, gave false answers to the USCIS interviewing officer to make the marriage appear legitimate.

58.  On or about August 18, 2008, KRASAUTSAU told an unindicted co-conspirator that KRUS has been living in Belarus for a couple of months, the business goes on like before, KRUS stays like he was, he is just located in Belarus now and we are managing on our own.

59.  On or about August 31, 2007, HARUTYUNYAN  picked up CI2 and several other B2 Jamaican tourists from the bus stop and drove them to ███████████████████████ ████ in Virginia Beach where they would live while being employed by HARUTYUNYAN.

60.  On or about September 1, 2007, HARUTYUNYAN drove CI2 to several locations looking for work. Approximately two weeks later HARUTYUNYAN found CI2 a job at the Hilton Hotel at the Oceanfront in Virginia Beach.

61.  On or about September 18, 2007, separately indicted co-conspirator Jeremy Emrick called separately indicted co-conspirator Valeryia Tysmbal and told her he was afraid they were going to get caught for being in a fake marriage.   Valeryia Tysmbal told him to shut his mouth.

62.  In or about October 2007, HARUTYUNYAN charged CI2 $300 for rent at 1013 Chinquapin Lane, Apartment 201.

63.  On or about October 18, 2007, an unindicted co-conspirator called the Virginia Beach Police Department three times in an attempt to find his girlfriend separately indicted co-conspirator Valeryia Tysmbal after she had been arrested for marriage fraud.

64.  On or about October 18, 2007, an unindicted co-conspirator called KRUS four times to speak about the arrest of Valeryia Tysmbal.


65.  On or about October 18, 2007, KRUS called the Hampton Roads Regional Jail, the Newport News Sheriff Office, the City of Virginia Beach Municipal office building, the Virginia Beach Sheriff's Office and the Portsmouth City Jail in an attempt to find out what happened to Valeryia Tysmbal.

66.  From in our about October 19, 2007 to in our about October 22, 2007,an unindicted co-conspirator and KRUS spoke 25 times via the telephone.

67.  On or about October 19, 2007, an unindicted co-conspirator contacted a law firm for the purpose of providing representation to Valeryia Tysmbal.

68.  On or about October 20, 2007, an unindicted co-conspirator and separately indicted Tatsiana Smuraha Jeremy Emrick six times to inform him he might be in trouble because Valeryia Tsymbal had been arrested.  Tatsiana Smuraha called Jeremy Emrick send her bank statement to prove the marriage was real.

69.  On or about October 22, 2007, an unindicted co-conspirator and separately indicted Tatsiana Smuraha  contacted co-conspirator Jeremy Emrick (Emrick) and told him that he must say his marriage to Tysmbal was real, any other story Emrick told would not help Tysmbal or Emrick.  Tatsiana Smurha told Jeremy Emrick not to speak on the phone.  An unindicted co-conspirator told Jeremy Emrick he could not change his story and that Jeremy Emrick must say he married Valeryia for the right reasons.

70.  On or about October 22, 2007, an unindicted co-conspirator told KRUS that the lawyer for Valeryia Tsymbal could cost $15,000.

36

71.   On or about October 22, 2007, KRUS called KRASAUTSAU and told him to withdraw $15,000.

72.   On or about October 22, 2007, KRASAUTSAU withdrew $15,000 in cash and purchased a cashiers check.

73.   On or about November 15, 2007, in Virginia Beach, Virginia, KRUS executed a corporate lease at 4715 Jeanne Street #101 listing TEGLASI and BOND as emergency contacts.

74.   On or about November 28, 2007, in Portsmouth, Virginia, KRUS executed a corporate lease for Valet Services at 311 North Street , Unit One.

75.   On or about December 1, 2007, KRUS executed a corporate lease for Valet Services, Inc. at 4719 Jeanne Street #204, the lease agreement being completed by KRASAUTSAU who listed his employment with Valet Services.

76.   On or about December 7, 2007, KRUS submitted Form ETA 750 to the VEC requesting that 93 named alien workers be issued H2B visas for the period from 04/01/2008 to 01/10/09 on behalf of Valet Services, Inc. to perform work as "Loader" at CAT of Petersburg, 999 Wagner Road, Petersburg, Virginia,  namely, to "Take verbal instructions to understand work assignments; Clean the yard, vehicles and parking lots. pick up trash; Wrap protective materials along the vehicle's front and rear bumpers; Inspect vehicles for physical damage."  An employer contract signed by MARTIN, Manager, CAT of Petersburg, on October 29, 2007 accompanied the ETA 750.

77.   On or about December 7, 2007 KRASAUTSAU submitted Form ETA 750 to the VEC requesting that 185 unnamed alien workers be issued H2B visas for the period from 04/01/2008 to 01/10/2009 on behalf of Valet Services, Inc. to perform work as "Housekeeper" at Double Tree Hotel, Virginia Beach and Norfolk, Renaissance Portsmouth Hotel, Portsmouth,

and Embassy Suites, Hampton, Virginia, namely, to "Keep hotel premises in clean and orderly condition, clean floors, shampoo rugs, wash walls and windows, remove rubbish, clean guest rooms, make beds, replenish linens and vacuum." Employer contracts signed by General Manager (signature illegal), Double Tree Hotel, Virginia Beach, October 30, 2007, and by Christopher Thiele, Director of Finance, on October 23, 2007, and by General Manager (signature illegible), Renaissance Portsmouth Hotel on October 30, 2007, and the Richard Ligenfelter, Assistant General Manager, Executive Suites on October 24, 2007, along with the signature of KRUS accompanied the ETA 750.

78. In or about February 2008, BOND told his girlfriend that he married CEREDNICENKO for money and it was a fake marriage. CEREDNICENKO gave BOND a Toyota Corolla as part of his compensation for entering the marriage and when BOND wrecked the Corolla, CEREDNICENKO provided BOND with a Honda Civic.

79. On or about February 28, 2008, in Norfolk, Virginia, KRUS appeared at USCIS for an interview to adjust his immigration status to a lawful permanent resident. During that interview KRUS gave false or inconsistent answers concerning his employment, his relationship with CEREDNICENKO, his travel to Belarus, and his criminal record.

80. On or about February 28, 2008, after an interview with USCIS, KRUS drove to 508 Birdneck Rd, Unit G and picked up CEREDNICENKO.

81. In or about March 2008, HARUTYUNYAN asked CI1 to find ten women and a few men to work for him. CI1 asked if HARUTYUNYAN would petition for them to come in the United States legally to work and HARUTYUNYAN refused.

38

82.  On or about March 5, 2008, in Miami, Florida, CI1 entered the United States via a B2 tourist visa.  CI1 also brought five Jamaican citizens who also had B2 visas, including CI2, to work for HARUTYUNYAN.

83.  On or about March 6, 2008, HARUTYUNYAN told the Jamaicans that they would be working at Gold Key, and $86 would be deducted from their paychecks to cover the cost of the uniforms they were required to wear.

84.  In or about April 2008, KRUS transferred $245,000 from his accounts in United States' banks to Belarus which preceded him flying there.

85.  On or about April 3, 2008, CI1 called KRASAUTSAU and asked him to pick her up at the airport.  KRASAUTSAU stated that a tall man would pick her up.

86.  On or about April 3, 2008, an unindicted co-conspirator R.K. picked up CI1 and drove her to 508 Birdneck Road, Virginia Beach, Virginia, where Staff Supply and Valet Services were located.   R.K. then drove CI1 to ████████████ where CI1 would be living.  R.K. told CI1 that "Viktar, Dmitry or Gabriel" would arrive sometime tomorrow to speak to her.

87.  On or about April 3, 2008, R.K. then traveled to ████████████ and met with TEGLASI and shook hands.

88.  On or about April 4 2008, KRASAUTSAU picked up CI1 and drove her around Williamsburg.

89.  On or about April 4, 2008, in Virginia Beach, Virginia, KRASAUTSAU asked CI1 what type of visa she had and CI1 told KRASAUTSAU that she had a tourist visa.  KRASAUTSAU advised CI1 not to tell the other women in her apartment that she had a tourist visa because they are nosey and will talk.

90.  On or about April 4, 2008, in Williamsburg, Virginia, KRASAUTSAU asked CI1 for her passport and when she could not produce it he became suspicious.

91.  On or about April 4, 2008, CI1 told KRASAUTSAU that she was here illegally and asked if KRASAUTSAU would deport her.  KRASAUTSAU replied, "Me and Viktar . . . we don't give a f**k who you are or what you have."

92.  On or about April 17, 2008, KRASAUTSAU and KRUS began employing CI1 at the Double Tree hotel in Virginia Beach.

93.  On or about April 24, 2008, CI1 was paid by TEGLASI with a check that had an address of Q.C. Inc. 419 Barberton Drive, Virginia Beach, Virginia 23451.  No taxes were withheld from her earnings in the check.

94.  On or about April 29, 2008, in Virginia Beach, Virginia, TEGLASI told CI1 that he was taking some workers to Florida and asked CI1 if she had her papers.  When CI1 responded in the negative, TEGLASI stated he could only take legal workers to Florida because immigration was cracking down and deporting people.

95.  On or about April 29, 2008, in Virginia Beach, TEGLASI moved CI1 from ███ ██████████████ to ███████████████.

96.  On or about April 29, 2008, unindicted co-conspirator A.C. arrived in the United States via a B2 tourist visa for the purpose of working for KRUS and KRASAUTSAU and traveled to Virginia.

97.  On or about April 29, 2008, KRASAUTSAU moved A.C. to California to work.

98.  On or about May 1, 2008, in Virginia Beach, Virginia, BOND traveled to 508 Birdneck Road Unit G, Virginia Beach, Virginia 23451 to make sure his rent was going to be payed by CEREDNICENKO.

40

99.  On or about May 2, 2008, in Virginia Beach, Virginia, BOND burglarized 508 Birdneck Road Unit G, Virginia Beach, Virginia 23451 and stole blank payroll checks with address of Q.C. Inc., 419 Barberton Drive, Virginia Beach, Virginia 23451.

100.  On or about May 16, 2008, unindicted co-conspirator A.C. told a police officer that he was "sight-seeing and hiking in the mountains of Milpitas, California when A.C. was stopped in a van along with several other unindicted co-conspirators who possessed checks from Q.C. Inc. located at 419 Barberton Drive, Virginia Beach, Virginia 23451.

101.  On or about July 3, 2008,  in Richmond, Virginia, Labor Source Inc. was terminated by the Virginia State Corporation Commission.

102.  In or about August 2008, KRUS, KRASAUTSAU, TEGLASI, and POCHTARUK fraudulently prepared and submitted an application for an H2B petition for 93 material handling positions at the Petersburg Rail Terminal knowing that few if any of the foreign workers who would be admitted into the United States on this petition would ever work at the rail terminal.

103.  On or about August 1, 2008, in Virginia Beach, an unindicted co-conspirator (M.S.) executed a lease at 713 Shadwell Court, Unit 15E.  M.S. listed Quality Cleaning as his employer and his address at ████████████████ and his current landlord as TEGLASI.  M.S. was accompanied by TEGLASI who did most of the talking when the lease was signed.

104.  On or about August 7, 2008, KRASAUTSAU called Virginia Dominion Power and posed as an unindicted co-conspirator (M.G.) for the purpose of setting up a power account at ████████████████ Virginia Beach, in M.G.'s name.

105.  On or about August 7, 2008, KRASAUTSAU called KRUS to confirm that they were going to let POCHTARUK prepare an H2B petition using Valet Services for 185 foreign

housekeepers to work at four hotels - Double Tree in Virginia Beach and Norfolk, Renaissance

Portsmouth Hotel, Embassy Suites in Hampton.   KRASAUTSAU stated at the low estimate

they needed 90 workers, TEGLASI needed 50 workers in Florida, and POCHTARUK would

take the rest of the people they would not need. KRUS stated, "I don't want any more of this

f**king stress but you can guess it yourself that this is so f**king shady that f**k with God's

help it will all like go quietly."

106.  On or about August 11, 2008, a potential H2B worker called KRASAUTSAU and

asked him were the conditions suitable for humans in the apartments he supplied for workers.

KRASAUTSAU replied they conditions were not suitable for humans and most likely you would

be somewhere on a mattress, not a regular bed.   The worker informed him that

KRASAUTSAU was the only option for working in Virginia Beach.

107.  On or about August 12, 2008, KRASAUTSAU told POCHTARUK he could not

supply her with up-to-date payroll records or quarterly tax returns for his companies necessary

for applying for H2B petitions.   POCHTARUK assured KRASAUTSAU that he could provide

payroll for a few seasonal workers.

108.  On or about August 12, 2008, KRASAUTSAU explained to an H2B-petitioned

worker that KRASAUTSAU could not pay the worker $7.50 per hour because then Americans

might apply for the jobs and he could not get foreign workers into the United States to take the

jobs.

109.  On or about August 13, 2008, unindicted co-conspirator (O.K.) called

KRASAUTSAU and told him she and two other girls wanted to apply for tourists visas so they

could remain in the United States and work illegally in the United States after their J1 student

exchange visas expired.  KRASAUTSAU said O.K. needed a bank account statement that

showed deposits of $3,000.  O.K. stated she did not have the much money and KRASAUTSAU agreed to lend her the money for one day so she could deposit it, get an account statement, then withdraw the money the next day to give back to KRASAUTSAU.   KRASAUTSAU stated the visa would be $550.

110.  On August 14, 2008, KRASAUTSAU instructed O.K. to walk to the bank deposit the money and then take it back.   KRASAUTSAU said, "Make sure it is not an even amount, it stays there overnight and the next day you come in the morning and say I would like to get a bank statement, then the moment you get a statement you go ahead and withdraw the money."

111.  On or about August 18, 2008, KRASAUTSAU asked WHITNEY and POCHTARUK if he could forward documents showing some of the H2B workers had already paid to be put on an extension petition and then get a receipt saying the money was already spent and he could not pay back the workers.  WHITNEY and POCHTARUK agreed it would be smarter to do separate receipts.

112.  On or about August 19, 2008, ANASTASSIYA NAGIBINA contacted KRASAUTSAU and asked what paperwork she would have to supply to convert her expiring J1 visa into a tourist visa so she could stay in the United States and work.  KRASAUTSAU outlined the paperwork ANASTASSIYA NAGIBINA would need and said it would cost $550. ANASTASSIYA NAGIBINA confirmed she needed proof of a bank account with $3,000 in it for the application.

113.  On or about August 20, 2008, KRASAUTSAU called an unidentified co-conspirator (Aloyna) and KRASAUTSAU said, "In short, I need to keep my girl here."   Aloyna asked if KRASAUTSAU would do a tourist visa for her and KRASAUTSAU said he would like to do a student visa.  Aloyna said even with a student visa unindicted conspirator (E.S.) would

have to show up to class once every two weeks and eventually take an exam.  Alyona suggested
E.S. get married to get a green card.  KRASAUTSAU said he could not help E.S. by marrying
her because he needed two years to become a citizen.

114.  On or about August 20, 2008, KRASAUTSAU filed fraudulent applications for
tourist visas for ANASTASSIYA NAGIBINA  and POLINA KULESH for the purpose of
replacing their expired J1 visas and allowing them to work illegally in the United States.

115.  On or about August 22, 2008, POCHTARUK confirmed with KRASAUTSAU that
the current H2B petition for the Petersburg rail terminal contains 56 names.  KRASAUTSAU
agrees, stating, "56 pains in the ass."

116.  On or about August 22, 2008, KRASAUTSAU called an unindicted co-conspirator
(A.K.) and asked A.K. how he kept his girlfriend in the country.  A.K. responded just like
KRUS, I had her marry one of the Americans who used to work for A.K. at the rail terminal.

117.  On or about August 22, 2008, SHERYL BROWN called KRASAUTSAU to tell
him that unindicted co-conspirator (R.F.), who was going to enter the United States on a B2
tourist visa to work, was going to arrive in the United States on August 27, 2008.
KRASAUTSAU agreed to pick up R.F. at the airport.

118.  On or about August 23, 2008, KRASAUTSAU told TEGLASI that
KRASAUTSAU had thrown a party with some Americans to see if he could find a fake husband
for E.S. so she could apply for a green card.   TEGLASI responded, "This is not a good idea",
and KRASAUTSAU said, "But is not f**king Navy."

119.  On or about August 24, 2008, KRASAUTSAU explained to an H2B petitioned
worker that KRASAUTSAU could not pay the worker $ 7.50 per hour because locals might
apply for the jobs and he could not get foreign workers into the United States to take the jobs.

120.  On or about August 25, 2008, KRASAUTSAU called KRUS in Belarus and told KRUS that a collection agency was trying to collect $ 18,000 from one of KRUS's companies for worker's compensation.  KRUS told KRASAUTSAU to tell them, "The company is dissolved, if anything say company dissolved a long time ago, out of business."

121.  On or about August 25, 2008, unindicted co-conspirator R.F. called KRASAUTSAU from Jamaica and told KRASAUTSAU that R.F. was coming to the United States to work.  KRASAUTSAU asked R.F. what he would say at the border and R.F. replied "I am going to tell them that I'm coming for a vacation."

122.  On or about August 26, 2008, R.F. called KRASAUTSAU from Jamaica and asked KRASAUTSAU what address R.F. should give when he entered the United States. KRASAUTSAU replied ████████████ in Williamsburg and said, "Do not give them my phone number, too many people come and give my phone number, it is not good."

123.  On or about August 26, 2008, KRASAUTSAU called an unidentified co-conspirator (Danya) and asked it would be possible for KRASAUTSAU to falsely file for asylum for unindicted co-conspirator E.S.   Danya asked if E.S. was dark skinned because that worked better for political asylum cases.  When KRASAUTSAU replied that E.S. was light skinned he asked if falsely filing for asylum would allow them to play for more time.  Danya replied he knew of some Russian guys who went to jail and were illegally in the United States and their lawyers started asylum proceedings just to buy them some time.

124.  On or about August 26, 2008, in Virginia Beach, KRASAUTSAU spoke to an unindicted co-conspirator (D.D.) and told him that KRASAUTSAU decided to do a fraudulent student visa for E.S. so she could remain in the United States.  D.D. agreed this was better than marriage fraud because those people were shaking in fear the rest of their f**king lives.

45

KRASAUTSAU said he spoken to others who had those arrangements done and said, "They are all f**king Mashka (HALUSHKINA) they are shaking in her boots all the time."

125.  On or about August 26, 2008, KRASAUTSAU called POCHTARUK and confirmed that E.S.'s J1 student exchange visa would expire on September 30, 2008. POCHTARUK offered to remove one of the Jamaican names on the current approved H2B petition and substitute E.S.   KRASAUTSAU suggested doing an F1 student visa. POCHTARUK assured KRASAUTSAU that they could stretch it out for up to three years and E.S. could study English as a second language to stay in the United States.

126.  On or about August 27, 2008, R.F. entered the United States via a B2 tourist visa and traveled to Norfolk, Virginia where he was picked up by KRASAUTSAU.

127.  On or about August 27, 2008, in Virginia Beach, KRASAUTSAU, KRUS, TEGLASI housed R.F. at ███████████████ for the purpose of R.F. working.

128.  On or about August 28, 2008, KRASAUTSAU transported RF from ███████ ██████████████ to the Marriot in Newport News.

129.  On or about August 28, 2008, KRASAUTSAU, KRUS, TEGLASI housed R.F. at ███████████████ Newport News, Virginia for the purpose of employment at the Marriot in Newport News, Virginia.

130.  On or about August 28, 2008, KRUS told his mother that if he died during a heart surgery operation in Belarus, he wanted half his inheritance to go to his mother and half to CEREDNICENKO.

131.  On or about August 31, 2008, an unindicted co-conspirator called KRASAUTSAU to tell him the an unindicted co-conspirator  had some of the money he had borrowed and he had tried to give it to CEREDNICENKO but she had left to go to Belarus because KRUS was having

heart surgery.   KRASAUTSAU gave the unindicted co-conspirator  CEREDNICENKO's

number so he could make arrangements to pay.   An unindicted co-conspirator told

KRASAUTSAU that Valeryia Tsymbal was very broken up over KRUS having surgery.

132.  On or about August 31, 2008, Valeryia Tsymbal contacted KRUS to see how he

was fairing after surgery and she made plans to visit KRUS in Belarus so she could get her

laptop and cell phone from him.

133.  On or about September 2, 2008, L.H. called KRASAUTSAU from Jamaica and told

KRASAUTSAU she would be arriving in the United States tomorrow wearing a brown top and

her hair cut low.

134.  On or about September 3, 2008, KRASAUTSAU explained to POCHTARUK and

WHITNEY that the companies pay the H2B housekeepers by the room cleaned and not by the

hour, and they never paid overtime to workers.

135.  On or about September 3, 2008, an unindicted co-conspirator (L.H.) entered the

United States via a B2 tourist visa and traveled to Norfolk, Virginia and called KRASAUTSAU

to pick her up at the airport.  KRASAUTSAU told L.H. to sit outside and he would be arriving in

a brown truck.

136.  On or about September 3, 2008, KRASAUTSAU picked up L.H. at the airport and

drove L.H. to ███████████████ .

137.  On or about September 3, 2008, KRASAUTSAU, KRUS, TEGLASI housed L.H.

for the purpose of employment at the Westin Town Center.

138.  On or about September 3, 2008, KRASAUTSAU told an unindicted coconspirator

who was a Jamaican broker that a number of the workers supplied by the broker for the H2B

petition for Virginia Beach would be going to other locations including Florida.  The broker

agreed and said he wanted to send the workers where they can make some money.

139.  On or about September 3, 2008, an unindicted coconspirator (V.H.) entered the

United States via a C1/D cruise ship workers visa and traveled to Norfolk, Virginia.  V.H. called

KRASAUTSAU and told him he had arrived at the Norfolk Airport and need to be picked up by

KRASAUTSAU.  KRASAUTSAU then picked up V.H.

140.  On or about September 3, 2008, in Virginia Beach, KRASAUTSAU TEGLASI,

KRUS housed V.H. at ████████████████████ for the purpose of V.H. working Sheraton

Waterside.

141.  On or about September 3, 2008, KRASAUTSAU called KRUS in Belarus and told

him a collection agency was trying to collect $18,000 from Valet Services.  KRUS told

KRASAUTSAU he had closed all those accounts, "One needs to pay some taxes, why the f**k

should we need it.  What, like I am gonna pay $18,000."

142.  On or about September 3, 2008, KRUS called KRASAUTSAU from Belarus to

inform KRASAUTSAU that separately indicted conspirator Tatsiana Smuraha had been

sentenced to 14 months incarceration in criminal court.  KRUS asked KRASAUTSAU how

much time separately indicted co-conspirator Valeryia Tsymbal had done before being deported

and KRASAUTSAU replied 4 months.    KRUS replied it is simply mind blowing.

143.  On or about September 8, 2008, MARTIN called KRASAUTSAU and told him that

the veteran Jamaican material handlers at the Petersburg rail terminal did not want to train

the three new Russian workers because the Russians were paid a dollar more per hour.

KRASAUTSAU said he would confer with KRUS on this matter.  MARTIN then asked how the

veteran workers were going to pay for the extensions and still have money to eat because KRASAUTSAU and KRUS hold all of their money.  KRASAUTSAU replied the cost for the lawyer was $450 per application and the workers had to bear this cost.

144.  On or about September 8, 2008, TEGLASI, KRASAUTSAU, and KRUS housed a Jamaican worker at ████████████████████, who entered the United States on a B2 tourist visa for the purpose of working at Mahi Mah's for HARUTYUNYAN.

145.  On or about September 8, 2008, 33 minutes after the federal sentencing in Norfolk, Virginia of separately indicted co-conspirator Ruta Antanaviciute, KRUS called KRASAUTSAU from Belarus and informed KRASAUTSAU that Ruta Antanaviciute was given sixteen months incarceration.  KRASAUTSAU asked KRUS how he received this information and KRUS confirmed it was Valeryia Tsymbal.

146.  On or about September 10, 2008, KRASAUTSAU called KRUS in Belarus and told him they would not be able to use all 185 housekeepers on the current petition. KRASAUTSAU said POCHTARUK could take about half of them and one of the Jamaican brokers also stated she could find them jobs, KRASAUTSAU expressed concern that if they gave the workers to POCHTARUK they would not get paid, and if they gave them to Jamaican Broker 1, then Jamaican Broker 1 would compete with TAMAS in Jacksonville and TAMAS would lose money.

147.  On or about September 11, 2008, KRASAUTSAU, KRUS, and TEGLASI housed an out-of-status worker at ████████████████████ for the purpose of the employment at the Westin Hotel.

148.  On or about September 14, 2008, in Virginia, unidicted co-conspirator (A.A.) told KRASAUTSAU over the week we barely made forty hours and this is with seven days a week at

the Petersburg Rail Terminal.  KRASAUTSAU agreed to talk to MARTIN and find out just how many workers were needed in Petersburg.

149.  On or about September 15, 2008, WHITNEY called KRASAUTSAU to ask if it was one Jamaican broker in particular that was getting the denials from the embassy for H2B workers petitioned by KRASAUTSAU.

150.  On or about September 16, 2008, MARTIN complained to KRASAUTSAU that the Russian workers do not show up at the Petersburg rail terminal if less than 20 rail cars come in on a given day.  MARTIN stated that leaves me with like three or four guys.

151.  On or about September 16, 2008, WHITNEY requested KRASAUTSAU transfer the funds for the workers on the current H2B petition at the Petersburg Rail Terminal.

152.  On or about September 17, 2008, ANASTASSIYA NAGIBINA and POLINA KULESH called KRASAUTSAU to ask how they could check with immigration to see the status of the tourist visa applications KRASAUTSAU had fraudulently filed for them in the past.

153.  On or about September 18, 2008, WHITNEY and POCHTARUK called KRASAUTSAU.  POCHTARUK confirmed she could take 75 of the 185 workers who were petitioned for Virginia Beach to work in Florida and Louisiana.   KRASAUTSAU refused to commit to an actual number of workers to transfer to POCHTARUK until he could determine his own need.  KRASAUTSAU confirmed the first batch of workers would arrive in the United States on September 25th.

154.  On or about September 19, 2008, KRASAUTSAU called TAMAS to ask him how many of the 185 workers he would need,   TAMAS estimated he needed ten housekeepers.

155.  On or about September 19, 2008, WHITNEY called KRASAUTSAU and pressed him to give her an exact count of the workers WHITNEY and POCHTARUK would be getting

from the H2B petition for Virginia.  WHITNEY stated she wanted the workers to fly to Orlando because they had accommodations and orientation for the workers.  WHITNEY confirmed they would place four Jamaicans in each hotel room when they first arrived in the United States. KRASAUTSAU confirmed this would be okay for one night.   POCHTARUK confirmed the workers she took would be paying $75 per week in rent and get $7.50 per hour in salary.

156.  On or about September 19, 2008, in Newport News, Virginia, R.F. called KRASAUTSAU and told him that R.F. was working at the Marriot and wanted to know why he had not been paid for the last three weeks of work.

157.  On or about September 21, 2008, KRASAUTSAU called KRUS in Belarus.  KRUS told KRASAUTSAU that he had to file tax documents in Belarus for the money that KRUS had transferred from the United States previously that year. KRUS said his goal was not to show authorities what is what.

158.  On or about September 22, 2008, KRASAUTSAU called USCIS to check on the fraudulent petition he filed for a tourist visa for ANASTASSIYA NAGIBINA.

159.  On or about September 22, 2008, ANASTASSIYA NAGIBINA and POLINA KULESH called KRASAUTSAU to see if he called USCIS on their behalf.

160.  On or about September 22, 2008, POCHTARUK informed KRASAUTSAU that for the workers she and WHITNEY were taking, from KRASAUTSAU's H2B petition for Virginia, each of them had to pay up front $450 for the first months rent and a security deposit. KRASAUTSAU stated this may be a problem because in the past many H2B petitioned workers came into the United States and then just left their jobs.  The last petition KRASAUTSAU got 100 people and about 20 left in the first three weeks.   POCHTARUK confirmed the workers sent to Pensacola, Florida and Louisiana would be cashiers who would get lots of overtime.

51

POCHTARUK also stated she need a $75 deposit from the workers and they would get the next visa extension free.  KRASAUTSAU stated the agents in Jamaica did not like that arrangement because workers stayed in the United States continuously and then they would not go back to Jamaica to be charged by the agents for their next work period.

161.  On or about September 22, 2008, POCHTARUK told KRASAUTSAU that she wanted 30 workers from KRASAUTSAU's H2B petition to go to Florida and the next group of 30 workers to Louisiana.

162.  On or about September 22, 2008, KRASAUTSAU told POCHTARUK that she would be getting 20 workers petitioned for Virginia from Jamaica when they entered the United States, POCHTARUK told KRASAUTSAU she would tell the broker in Jamaica that POCHTARUK was the coordinator for Valet Services for the Florida Region.

163.  On or about September 22, 2008, KRASAUTSAU told a Jamaican Broker that 15 people in the group being sent from Jamaica were going to Virginia Beach and the rest would be going to our supervisor in Florida, the ladies name is Patty. [POCHTARUK]

164.  On or about September 23, 2008, in Virginia Beach, Virginia KRASAUTSAU, KRUS, and TEGLASI housed an out-of-status worker (M.G.) at ██████████ for the purpose of employment.

165.  On or about September 24, 2008, KRASAUTSAU told a Jamaican Broker when that lady calls you her name is Patricia, Patty [POCHTARUK] and in case you cannot get in touch with Dana [WHITNEY] Patty is her partner, so you can speak with either Patty or Dana.

166.  On or about September 24, 2008, KRASAUTSAU spoke to HARUTYUNYAN and told him that KRASAUTSAU did not think that it would be this slow, everybody is f**king complaining, the economy is f**king down, we are in deep s**t.  KRASAUTSAU then told

52

HARUTYUNYAN he could throw some Jamaicans your way next week, KRASAUTSAU told HARUTYUNYAN you tell me how many you'd need, I'll give you.

167.  On or about September 25, 2008, a Jamaican broker confirmed the first batch of workers arrived in the United States, the broker told KRASAUTSAU that POCHTARUK wanted 40 more housekeepers.

168.  On or about September 26, 2008, KRUS told KRASAUTSAU to tell HALUSHKINA that KRUS was not here and KRASAUTSAU is the boss now so do what he needs you to do.  KRASAUTSAU replied, you cannot compare HALUSHKINA to CEREDNICENKO, because CEREDNICENKO is watching over her own money, HALUSHKINA is not.  KRUS replied we have $300,000 in arrears due to us including Holiday Inn.

169.  On or about September 26, 2008, in Virginia Beach, an unindicted coconspirator (SB) who entered the United States on a B2 tourist visa and was working illegally for KRASAUTSAU was stopped by the Virginia State Police while driving without a license with a van full of Jamaican H2B petitioners.

170.  On or about September 26, 2008, in Virginia Beach, KRASAUTSAU called BARAVIK and told him that SB had been stopped by the police and BARAVIK needed "to pick up the van f**king full of people at exit 19."

171.  On or about September 26, 2008, in Virginia Beach, KRASAUTSAU instructed HALUSHKINA to pick up BARAVIK and take him to where the van driven by SB was stopped on I-264.

172.  On or about September 26, 2008, in Virginia Beach, BARAVIK responded to the roadside of I-264 near Exit 17 where SB had been pulled over by the police with a load of Jamaican nationals on H2-B petitions

173.  On or about September, 26, 2008, in Virginia Beach, BARAVIK told KRASAUTSAU that he did not want to ask the policeman too many questions because the policeman might start in on BARAVIK.

174.  On or about September 28, 2008, UKOLOV called KRASAUTSAU from Chicago and told him one of the workers fell and hurt his leg, UKOLOV drove him to the hospital so there were less f**king questions.  KRASAUTSAU told UKOLOV to call KRUS and tell him about the accident.

175.  On or about September 29, 2008, CEREDNICENKO and KRUS called KRASAUTSAU from Belarus.  KRASAUTSAU informed them that UKOLOV had taken an injured worker in Chicago to the hospital.  CEREDNICENKO and KRUS agreed to pay the hospital bill as long as the worker did not ask for workers comp.  KRASAUTSAU said, "We will pay him a thousand, well for the fact that he was not singing."  CEREDNICENKO replied, "Well, yes.  We'll pay him some bonus so that he wouldn't cry."

176.  On or about September 29, 2008, sixteen Jamaican nationals petitioned by KRUS to work in Virginia as housekeepers arrived in Orlando, Florida.

177.  On or about September 30, 2008, in Orlando, Florida, POCHTARUK met with the sixteen Jamaican nationals who arrived in the United States the day before who were legally allowed to only work in Virginia and gave them orientation for their jobs in Florida, Alabama, and Louisiana.

178.  On or about September 30, 2008, the sixteen Jamaican nationals were transported to a Social Security office for the purpose of obtaining social security cards to allow them work.

179.  On or about September 30, 2008 in Virginia Beach, HALUSHKINA called KRASAUTSAU to remind him to put Valeryia Tsymbal's belongings in a car that KRASAUTSAU was going to be shipped overseas to KRUS.

180.  On or about September 30, 2008, KRASAUTSAU contacted an unindicted co-conspirator who worked at the shipping company, the organization used to ship automobiles overseas, and confirmed that Valeryia Tsymbal's belongings would be placed into on of the cars KRUS would receive in Europe.

181.  On or about October 1, 2008, in Virginia Beach, VA, KRASAUTSAU called HALUSHKINA, HALUSHKINA asked KRASAUTSAU what rate should be use for unindicted co-conspirator V.H., either it is a server, then it is seven dollars to pay, or its housekeeping plus tips - ten fifty an hour.

182.  On or about October 1, 2008, KRASAUTSAU called KRUS in Belarus and told him that TEGLASI had bought a hot tub and installed it at ███████████. KRASAUTSAU told KRUS that TEGLASI needed to be legalized then he would enjoy life, otherwise if anything happened TEGLASI's girlfriend will get everything and that would be a shame.

183.  On or about October 2, 2008, KRASAUTSAU told POCHTARUK that she will get a total of 90 more workers petitioned to work in Virginia.

184.  On or about October 2, 2008, a worker who was illegally redirected from Virginia Beach to Fairhope, Alabama called KRASAUTSAU to tell him she had to walk three miles to

Wendy's to work each day.  KRASAUTSAU offered to move the worker to St. Augustine, Florida to work as a housekeeper.

185.  On or about October 2, 2008, in Florida, TAMAS called KRASAUTSAU and told him a girl from Alabama called about work.  KRASAUTSAU confirmed the girl was on one of their H-2B petitions and  replied, "We have too many people, I ordered about 57 for you and you only needed three.  I had to send them somewhere, so I send them to Alabama, I send them everywhere."

186.  On or about October 3, 2008, in Virginia Beach, KRASAUTSAU told HARUTYUNYAN, "Take as many [Jamaicans] as you want, we have f**king oodles of people."          187.  On or about October 6, 2008, in Virginia Beach, KRASAUTSAU took a worker (Yvonne) to Wal-Mart for pain medication after she was crushed by a bunk bed which failed under the weight of the worker sleeping above her.  KRUS and TEGLASI had fixed the bunk bed with plastic zip ties earlier that year.

188.  On or about October 7, 2008, a Jamaican broker called KRASAUTSAU to complain that workers who were supposed to be in Virginia were sent all over the country by other companies.  The broker asked if for this next batch of workers should he just find them a contractor with jobs because the workers will only be in the United States for two months and they should at least break even.  The broker said that the workers who went to POCHTARUK were getting charged three hundred dollars for rent and they were not getting any work.

189.  On or about October 7, 2008, a Jamaican broker told KRASAUTSAU that her workers were not sent to Florida to work as housekeepers but instead were sent by POCHTARUK to Alabama and Louisiana to work in fast food restaurants and, the living conditions were poor.

190.  On or about October 8, 2008, WHITNEY and POCHTARUK agreed with KRASAUTSAU that they would provide half of the $450 deposit required by the employer housing the workers illegally diverted from Virginia.  KRASAUTSAU asked if they could provide the entire deposit and just deduct it from the worker's paychecks, and POCHTARUK said the workers would never catch up and they are always going broke and complaining. WHITNEY stated the worker's first check would be for $500 and after the deposit they would have $50 to use for food during the first two weeks.

191.  On or about October 8, 2008, WHITNEY and POCHTARUK requested that the Valet Services payroll be used to pay the workers illegally diverted from Virginia to other states. KRASAUTSAU asked how that would work and WHITNEY stated you do not pay them until you get the money from us.  POCHTARUK suggested they do it this way on for the first to weeks so KRASAUTSAU did not run into any trouble with workers' comp.

192.  On or about October 9, 2008 a housekeeping supervisor from the Norfolk Sheraton called KRASAUTSAU and told him he would have to take Yvonne to a doctor for medical attention because a bed had fallen on her.  The supervisor also told KRASAUTSAU he needed to get an exterminator for the apartment he was housing the workers in because it was infested with roaches.

193.  On or about October 9, 2008, KRASAUTSAU asked TEGLASI if he could take Yvonne to the hospital. TEGLASI said he would have unindicted co-conspirator R.K. take Yvonne to the hospital.

194.  On or about October 9, 2008, R.K. transported Yvonne to the hospital and asked KRASAUTSAU if he could leave Yvonne there because the line was to long. KRASAUTSAU ordered R.K. to wait.

195.  On or about October 9, 2008, Yvonne informed KRASAUTSAU that she had a torn muscle in her lower back, could not lift anything heavy, and she needed KRASAUTSAU to pay for the prescriptions because she had no money.  KRASAUTSAU told Yvonne he would get her a special belt like for an athlete.

196.  On or about October, 9, 2008, an unindicted co-conspirator (A.N.) called KRASAUTSAU from the Petersburg Rail Terminal and told KRASAUTSAU that agents were checking the terminal.  KRASAUTSAU wanted to know if the agents were from Immigration and A.N. asked if they should make themselves scarce or not.

197.  On or about October 9, 2008, KRASAUTSAU called KRUS in Belarus to tell KRUS that agents were checking the workers at the Petersburg Rail Terminal.

198.  On or about October 9, 2008, KRUS called KRASAUTSAU from Belarus and told him it was the Norfolk Southern Police who were checking the terminal.  KRASAUTSAU informed KRUS the workers were asking if they should "make tracks" and KRUS replied, "Yes, f**king make tracks, they closed the company, there ain't no money and new ones are needed." KRASAUTSAU replied there are no new workers for Petersburg.

199.  On or about October 9, 2008, MARTIN called KRASAUTSAU and told him a rail audit had been conducted at the Petersburg terminal and many of the employees lacked the proper badges.

200.  On or about October 9, 2008, a Jamaican Broker called KRASAUTSAU and asked if the workers who had previously entered the United States would get visa extensions. KRASAUTSAU confirmed that for the workers who were diverted to Florida, Louisiana and other states besides Virginia the pay would be $7.50 per hour and the extension would be free.

201.  On or about October 9, 2008, POCHTARUK confirmed with KRASAUTSAU that the next group of workers illegally diverted from Virginia would go to Knoxville, Tennessee and Pensacola, Florida.

202.  On or about October 13, 2008, KRASAUTSAU told KRUS that the Jamaicans did not want to work in the fast food industry, they were attempting to enforce their contracts which were for housekeeping jobs.  KRUS told KRASAUTSAU to tell the workers that the contract was for hotels and fast food and since the economy was down people are not staying in hotels, but they are still eating the chow.

203.  On or about October 14, 2008, POCHTARUK confirmed with KRASAUTSAU that the next batch of workers would be split with ten in Florida, six in Alabama and 17 in Louisiana. KRASAUTSAU asked if there where any housekeeping jobs and POCHTARUK said only fast food.

204.  On or about October 13, 2008, KRUS called KRASAUTSAU from Belarus to talk about the Petersburg Rail Terminal.  KRASAUTSAU explained that getting the rail badges was difficult, KRUS replied that they might lose the place, but so would they because the budget was structured so that it would not be profitable for them to hire those locals because they would simply be losing money.

205.  On or about October 16, 2008, TAMAS called HALUSHKINA from Florida to request the worker's comp for Howard Johnson.  HALUSHKINA told KRASAUTSAU that they did not have worker's comp. for Florida.

206.  On or about October 16, 2008, TEGLASI, KRASAUTSAU, and KRUS housed an out-of-status worker (U.E.) at 311 North Street, Unit 1 for the purpose of employing this worker at the Norfolk Sheraton Waterside Hotel.

207.  On or about October 17, 2008, KRASAUTSAU instructed HALUSHKINA to do light payroll for POCHTARUK using Valet Services checks with the taxes taken out. HALUSHKINA asked if the people worked for them, and KRASAUTSAU said they did not. HALUSHKINA asked if KRASAUTSAU had checked with KRUS first and KRASAUTSAU assured HALUSHKINA that KRUS was fine with this.  HALUSHKINA double-checked and asked if she should simply do real checks with taxes and KRASAUTSAU said yes.

208.  On or about October 17, 2008, KRUS called KRASAUTSAU from Belarus and instructed him to not take out taxes for the payroll checks they were doing for POCHTARUK. KRUS instructed KRASAUTSAU if there was a commotion just tell people our program considers everyone as potential Americans.

209.  On or about October 17, 2008, in Portsmouth, Virginia, TEGLASI, KRASAUTSAU, and KRUS housed an out-of-status Jamaican worker for the purpose of working at the Renaissance Hotel.

210.  On or about October 17, 2008, KRASAUTSAU told HARUTYUNYAN that the girls at the Clarion were only working two to three days per week for about three hours a day. KRASAUTSAU asked HARUTYUNYAN if he had any open housekeeping positions because the girls where whining they were going to leave and KRASAUTSAU told them to stay.

211.  On or about October 18, 2008, KRASAUTSAU called KRUS in Belarus and explained a Jamaican H2B worker requested a tax document and KRASAUTSAU suggested they give her a 1099.   KRUS told KRASAUTSAU to explain to her that she would have to pay almost 30% from the amount that she works and KRASAUTSAU needed to explain to her that we can do the taxes for you but you'll indicate how much you actually can spare.

212.  On our about October 18, 2008, KRASAUTSAU asked MARTIN if six total workers would be enough for working at the Petersburg Rail Terminal and Om replied yeah that should be enough.

213.  On or about October 20, 2008, a Jamaican broker called KRASAUTSAU and told him there were problems in Louisiana because one of the managers did not know WHITNEY and POCHTARUK.  KRASAUTSAU said he would call POCHTARUK.

214.  On or about October 20, 2008, KRASAUTSAU called WHITNEY an asked her to straighten out things in Louisiana.

215.  On or about October 20, 2008 KRUS called KRASAUTSAU from Belarus and requested KRASAUTSAU get an official tax document from the City of Norfolk so KRUS would have an example of the seals and stamps.  KRUS then explained they would make up a fraudulent stamp so he could show Belarus that he paid taxes in the United States.   KRUS requested KRASAUTSAU tell the tax office to kindly use a simple stamp so they would not have to spend a bundle creating the fake stamp.

216.  On or about October 20, 2008, TEGLASI, KRASAUTSAU, KRUS housed an unindicted co-conspirator (R.C.) who was out of status to work at ███████████ for the purpose of working at the Renaissance.

217.  On or about October 22, 2008, a Jamaican H2B worker who was petitioned by Valet Services to work in Virginia Beach, called KRASAUTSAU and said POCHTARUK had sent her to work at Wendy's in Alabama, and  in her first check for working at Wendy's POCHTARUK had deducted $350 and left her with $5 for two weeks of work.   KRASAUTSAU said he would call POCHTARUK.

218.  On or about October 24, 2008, KRASAUTSAU called WHITNEY in Florida and told WHITNEY that the hotels who his company contracts with do not want to know how much the workers get paid and the terms should not be defined in the new contract.

219.  On or about October 24, 2008, KRASAUTSAU spoke to WHITNEY and asked her about the new multi-year service agreements, KRASAUTSAU explained that if the hotels filled out the form with their actual needs for housekeepers there would be a large drop in need during January through March and it would not look so good for the Labor Department. KRASAUTSAU stated the hotels would not want to be bound by their forecasts of labor needs and WHITNEY agreed she would not want to sign that either.

220.  On or about October 24, 2008, in Virginia Beach, Yvonne, last name unknown, (LNU), who had earlier been crushed by a bed in housing supplied by KRUS, KRASAUTSAU and TEGLASI, asked KRASAUTSAU to get a new key made for the apartment he supplied her. KRASAUTSAU replied he was too busy and if Yvonne LNU kept bugging him she would not be put on the next extension which would allow her to keeping working.

221.  On or about October 29, 2008, KRASAUTSAU told KRUS that they had given HARUTYUNYAN five people who were on H2B petitions for KRUS and HARUTYUNYAN failed to find them employment and told KRASAUTSAU "what can I do there is no work."

222.  On or about October 29, 2008, KRUS and KRASAUTSAU agree to bribe an employee of the Norfolk Sheraton ten to fifteen cents a man hour, so they could have more workers employed there and KRUS an KRASAUTSAU agreed to take it out of HARUTYUNYAN's profit from the hotel.

223.  On or about October 30, 2008, in Virginia Beach, KRASAUTSAU told HALUSHKINA that she needed to cut a check for unindicted co-conspirator R.F. who was living at ████████████████

224.  On or about October 30, 2008, in Virginia Beach, KRASAUTSAU told an employee of the Westin Hotel that the reason we have to operate two companies with different names is because KRASAUTSAU cannot do visas for the people for one year, we can just do it for half a year.   We did it the same way last year.

225.  On or about October 30, 2008, KRASAUTSAU, TEGLASI, and KRUS housed R.F. at ████████████████ Newport News, Virginia for the purpose of employment at the Newport News Marriott.

226.  On or about October 30, 2008, KRASAUTSAU and HARUTYUNYAN discussed strategy on how to get the Sheraton Waterside to start paying them for overdue invoices for housekeeper labor.  HARUTYUNYAN told KRASAUTSAU he would tell the Sheraton that they were maintaining a lot of apartments for the workers and if the Sheraton did not pay, then KRASAUTSAU and HARUTYUNYAN could pay to house the workers.

227.  On or about November 3, 2008, KUKHARCHUK, HARUTYUNYAN's girlfriend, requested KRASAUTSAU to translate fraudulent documents falsely claiming she was part of the ZUBR student movement in Belarus which she needed for an immigration hearing to determine if her asylum petition was genuine.   KRASAUTSAU asked KUKHARCHUK what she would do if she lost the hearing and KUKHARCHUK replied she was staying in the United States no matter what happened at the hearing.

228.  On or about November 4, 2008, HARUTYUNYAN told KRASAUTSAU that the Sheraton requested they fax the worker's comp to them.  KRASAUTSAU laughed and asked

HARUTYUNYAN where would we get the worker's comp. HARUTYUNYAN told

KRASAUTSAU that he had greased a palm a little bit at the Sheraton.

229.  On or about November 4, 2008, KRASAUTSAU informed POCHTARUK that one

of the workers they illegally diverted to Alabama from Virginia worked 66 hours and received a

check for $20.  POCHTARUK replied it was because the worker had not paid her housing

deposit and first months rent up front when she arrived from Jamaica.

230.  On or about November 4, 2008, a Jamaican Broker called KRASAUTSAU and

informed him the workers they had been illegally diverted to Gatlingburg, Tennessee and were

dying of hunger because they could not cash the checks supplied by POCHTARUK.

231.  On or about November 5, 2008, KRASAUTSAU called POCHTARUK and told her

that in 2007, 60 of the 200 petitioned H2B workers from that year left their jobs for any reason.

POCHTARUK told KRASAUTSAU he should not let the Jamaicans get away with it because

the visas were very hard to get.

232.  On or about November 5, 2008, KRASAUTSAU called KRUS in Belarus to

request which company he should use for the new H2B contracts with the hotels in Virginia

Beach. KRUS assured KRASAUTSAU that they would file taxes eventually because some of the

hotels will issue W-9s, KRUS said, "Then we will get all the 1099 forms, itemize those f**king

expenses, show that we have spent everything, and Olga Fedorova will pay a little tax of fifteen

bucks or so."

233.  On or about November 5, 2008, in Virginia Beach, KRASAUTSAU requested an

employee of a contract hotel to forecast how many workers she would need in the next three

years, KRASAUTSAU explained this was necessary because the hotel needed people year

round, the hotel worker replied, "We have so many names of your company that it is

unbelievable, including Janitorial Solutions, Quality Cleaning, Valet, and Labor Source, I mean it is crazy."

234.  On or about November 6, 2008, HARUTYUNYAN picked up H2B workers who were petitioned to Valet Services at 1009 Chinquapin who where with TEGLASI and transported them Gold Key PHR career center and K-Mart.

235.  On or about November 7, 2008, one of the workers petitioned by Valet Services to work in Virginia Beach called KRASAUTSAU and asked, "Why are we in Gulf Breeze, Florida?"  KRASAUTSAU replied that Virginia is very slow now and KRASAUTSAU did not want them to sit at home and make no money.  The worker replied it was slow in Florida and she was only getting 32 hours per week and none of the workers liked it in Gulf Breeze, Florida.

236.  On or about November 14, 2008, KRUS called KRASAUTSAU from Belarus and told KRASAUTSAU to change the vehicle registration for a truck and van currently registered to Valet Services because a fine was imposed on the company in Chicago, Illinois and KRUS did not want the vehicles to be seized.  KRUS and KRASAUTSAU agreed to change the registrations into other co-conspirators' names.

237.  In or about November 14, 2008, KUKHARCHUK submitted fraudulent affidavits to the immigration court which falsely detailed her involvement with ZUBR, a Belarusian student group.

238.  On or about November 17, 2008, a housekeeping supervisor for the Norfolk Sheraton called KRASAUTSAU and told him right now we are giving all of the girls 4 days off, its gonna be pretty dead.  KRASAUTSAU replied that the girls knew that there will be a slow couple of months.

239.  On or about November 17, 2008, KRASAUTSAU explained to a housekeeping supervisor that he needed to maintain two companies with different names because H2B visa were for half a year and he needed two companies to keep the workers in the United States year round.

240.  On or about November 18, 2008, KRASAUTSAU asked HARUTYUNYAN to get one of the new labor contracts signed with a hotel.   KRASAUTSAU explained they needed to use both Janitorial Solutions and Valet Services because of the H2B visas.

241.  On or about November 18, 2008, KRASAUTSAU called KRUS in Belarus and informed him of the labor situation at the Newport News Marriott.  KRASAUTSAU and KRUS agreed to lower their labor cost to $9.50 per hour to allow them to compete with another vendor currently supplying illegal Mexican laborers to the hotel.  KRASAUTSAU and KRUS also agreed to bribe one of the Marriott employees 10 cents per man hour for every one of their workers who were employed with the hotel.

242.  On or about November 20, 2008, KRASAUTSAU told POCHTARUK that KRUS was concerned with the H2B workers on the Valet Services petition who were being diverted to POCHTARUK because of the possible liability if one of the worker was injured they might say they were on KRUS's visa but not on KRUS's payroll.  POCHTARUK agreed to give KRASAUTSAU and KRUS $50 per worker which was half of what she collected from each Jamaican worker for filing with the Department of Labor.

243.  On or about November 20, 2008 in Virginia Beach, KRASAUTSAU and TEGLASI had too many Jamaican H2B workers to fit in their current housing.   KRASAUTSAU and TEGLASI decide to put the excess Jamaicans in one of HARUTYUNYAN's apartments.

244.  On or about November 21, 2008, KRASAUTSAU and TEGLASI agreed to bribe an employee of the Westin Town Center Hotel in Virginia Beach 10 cents per man hour for every one of their workers in that hotel.

245.  On or about November 24, 2008, KRASAUTSAU called BARAVIK and told him, "The black [workers] needed to be moved from Chinquapin because the power was turned off." BARAVIK agreed to talk to HARUTYUNYAN and KRASAUTSAU and replied he needed to get the truck from E.S. and then he would come right over.

246.  On or about November 24, 2008, in Virginia Beach, KRASAUTSAU called HARUTYUNYAN and told him the workers needed to be moved for Chinquapin. HARUTYUNYAN told KRASAUTSAU they could put them at Linkhorn Bay.

247.  On or about November 24, 2008, KRASAUTSAU called BARAVIK and asked if some of KRASAUTSAU's troubled workers had moved out.  BARAVIK replied HARUTYUNYAN was going to deal with it in the evening.   KRASAUTSAU confirmed eight workers were supposed to move out of the apartment today and tomorrow KRASAUTSAU would remove a couple.  BARAVIK stated HARUTYUNYAN may already be relocating them.

248.  On or about November 24, 2008, POCHTARUK confirmed with KRASAUTSAU that three of the workers petitioned by Valet Services to work as housekeepers in Virginia Beach were going to Carlisle, Pennsylvania to work at the warehouse.

249.  On or about November 24, 2008, KRASAUTSAU called KRUS in Belarus to tell him there was a problem with the new labor petitions.   KRASAUTSAU had let Janitorial Services expire as a corporation and the newest labor petitions were using Janitorial Services as the labor provider.   KRASAUTSAU asked KRUS if KRUS remembered the address they registered at the time of incorporation because KRASAUTSAU could not remember.

250.  On or about November 24, 2008, POCHTARUK informed KRASAUTSAU the new labor petitions were at the State Workforce Associations in Virginia and Florida.

251.  On or about November 24, 2008, KRASAUTSAU attempted to use a nominee and a new company name with the Crown Plaza Hotel in Williamsburg, Virginia for the purpose of securing a labor contract so he could compete with one of his own companies who already had a contract with the hotel.  KRASAUTSAU failed to remove his original companies name of "Quality Cleaning" from the draft contract and  the general manager noticed it.

252.  On or about November 25, 2008, KRASAUTSAU told KRUS about being caught by the Crown Plaza Williamsburg.   KRUS asked KRASAUTSAU what other companies they had not used with that hotel in past and they agreed upon "Staffing VS."  KRUS told KRASAUTSAU to send "Those promotional materials, calendars, pens... like we are some really ass-kicking company, they will lap it up."

253.  On or about November 25, 2008, BARAVIK told KRASAUTSAU that BARAVIK had picked up the check from the Sheraton.  KRASAUTSAU said TEGLASI was already on the way there to pick it up.   BARAVIK said he would deposit the check into the bank.

254.  On or about November 25, 2008, KRASAUTSAU told POCHTARUK he was concerned that the current H2B petitions would not be approved in time to keep the workers in the United States.   POCHTARUK stated she had a "contact in the Department of Labor in Chicago" and she would try to push the labor cert. through with all her "powers" and "believe me I have someone of far reach."

255.  On or about November 25, 2008, POCHTARUK told KRASAUTSAU she was getting H2B petitioned workers by Valet Services for Virginia Beach from both Jamaican Broker

3 and Jamaican Broker 5.  POCHTARUK had no jobs for these workers so she would ask her other clients.

256.  On or about November 28, 2008, KRASAUTSAU called TAMAS and asked in which paper did we put the advertisement last year from the labor cert.  TAMAS replied that it was the St. Augustine Record.

257.  On or about November 28, 2008, Jamaican Broker 3 called KRASAUTSAU and told him one of the workers was complaining in Pennsylvania that she was supposed to work for Valet Services and not Catering Management and she threatened to call the Jamaican embassy.  KRASAUTSAU told Jamaican Broker 3 to "let the woman call, she has a job what is she going to do."

258.  On or about November 28, 2008, KRASAUTSAU told POCHTARUK that another worker who was petitioned to work in Virginia, was flying into Philadelphia and needed a ride.  POCHTARUK replied it was too expensive and the girl would have to sleep in the airport overnight and then catch a Greyhound bus to Carlisle, Pennsylvania where her job was located.

259.  On or about December 1, 2008, KRASAUTSAU told HALUSHKINA that soon people may start calling her about jobs in Florida, she must answer the phone with "Janitorial Solutions" and take the applicants information.

260.  On or about December 1, 2008, JANA MIZAKOVA called KRASAUTSAU and explained she was working at car dealership and her manager had requested piece of paper showing she was authorized to work.  KRASAUTSAU said you are applying for a tourist visa.  JANA MIZAKOVA stated,  I know I am not allowed to work but am I just supposed to quit.  KRASAUTSAU told JANA MIZAKOVA to tell her supervisor that she had applied for a visa but she had not received it yet so she could not show it to them.  KRASAUTSAU reminded

JANA MIZAKOVA she knew it was a tourist visa when she applied for it and JANA

MIZAKOVA said she knew that, she just was not expecting her employers to ask her about it.

261.  On or about December 1, 2008, one of the workers called from Louisiana to tell

KRASAUTSAU that POCHTARUK was taking out too much money in taxes, the workers had

worked for KRASAUTSAU in the past and never had paid this money for taxes.   The worker

complained that she received a check for $681.00 and after rent and taxes she only had $308.48

left.   Another worker came on the line and told KRASAUTSAU, "You are not supposed to take

Medicare out of our checks, Medicare is for old people in the USA, we are not old people, we

are young people."

262.  On or about December 1, 2008, a worker called KRASAUTSAU and asked how

much the visa extension was going to cost; KRASAUTSAU said between $650 and $700 and he

would check with the lawyer.

263.  On or about December 7, 2008, POCHTARUK explained to KRASAUTSAU that

the best workers on the current H2B petition that expired January 10, 2009 would be offered B2

tourist visas so they could remain in the United States working until they could be migrated onto

another H2B petition starting in February.  The other workers would be given notice that their

visa's had expired and they were no longer needed.

264.  On or about December 11, 2008, KRASAUTSAU confirmed with TEGLASI that

they have two banquets in Embassy Suites Hampton and Renaissance Portsmouth.

265.  On or about December 11, 2008, in Virginia Beach, Virginia, BARAVIK and

HARUTYUNYAN moved furniture into ███████████████ .

266.  On or about December 18, 2008, KRUS, KRASAUTSAU, and UKOLOV employed illegal aliens in Chicago, Illinois using the company Staff Supply Network for Caliber Auto Transfer.

**COUNTS TWO THROUGH ELEVEN**

On or about the dates specified below, in the Eastern District of Virginia and elsewhere, the defendants in the below-listed Counts did knowingly make under oath, and as permitted under penalty of perjury under Title 28, United States Code, Section 1746, did knowingly subscribe as true, false statements with respect to one or more material fact in applications, affidavits or other documents required by the immigration laws of the United States and regulations prescribed thereunder, and did knowingly present such applications, affidavits and other documents containing false statements, that is:

| Count | Defendant | Alien Beneficiary/Position Offered | Purported Employer | Fraud in ETA-750 Submission | Receipt date of ETA-750 |
|---|---|---|---|---|---|
| 2 | VIKTAR KRUS | 70 unnamed workers/ Motor Vehicle Operator | Caliber Auto Transfer | No taxes paid/withheld Invalid petitioner False statement re job open to qualified U.S. worker | 10/20/05 |
| 3 | VAHE HARUTYUNYAN | 93 unnamed workers/ Housekeeper | Six hotels in Virginia Beach | No taxes paid/withheld | 03/14/06 |
| 4 | VIKTAR KRUS | 60 unnamed workers/ Dining Room Attendant | Portsmouth Hotel | No taxes paid/withheld Fraudulent employer agreement Invalid petitioner | 08/02/06 |
| 5 | VIKTAR KRUS | 35 unnamed workers/ Housekeeper | Portsmouth Hotel | No taxes paid/withheld Fraudulent employer agreement Invalid petitioner | 08/02/06 |

| 6 | VIKTAR KRUS | 30 unnamed workers/ Food Server | Portsmouth Hotel | No taxes paid/withheld Fraudulent employer agreement Invalid petitioner | 08/02/06 |
|---|---|---|---|---|---|
| 7 | VIKTAR KRUS, OTIS MARTIN | 25 unnamed workers/ Material Handler-Vehicle Loader | Caliber Auto Transfer, Chesapeake | No taxes paid/withheld False statement re efforts to recruit workers | 03/16/07 |
| 8 | VIKTAR KRUS, | 22 unnamed workers/ Cleaner-Housekeeper | Hilton Garden Inn, Renaissance | No taxes paid/withheld False statement re efforts to recruit workers Overlapping petitions | 04/02/07 |
| 9 | DZMITRY KRASAUTSAU | 185 unnamed workers/ Housekeeper | Doubletree, Renaissance, Embassy, Suites | No taxes paid/withheld Use of second corp. to overlap petitions Invalid employer/work site | 07/20/07 |
| 10 | VIKTAR KRUS, DZMITRY KRASAUTSAU, JEKATERINA CEREDNICENKO, MARYIA HALUSHKINA, PATRICIA POCHTARUK, DANA WHITNEY, JANOS TAMAS | 185 unnamed workers/ Cleaner | Doubletree, Renaissance, Embassy, Suites, Hilton Garden Inn. | No taxes paid/withheld Invalid employer/work site Invalid payroll Fraudulent number of workers petitioned False statement re efforts to recruit workers | 12/07/07 |
| 11 | VIKTAR KRUS, DZMITRY KRASAUTSAU, JEKATERINA CEREDNICENKO, MARYIA HALUSHKINA, OTIS MARTIN, PATRICIA POCHTARUK, DANA WHITNEY | 93 unnamed workers/ Material Handler | Caliber Auto Transfer, Petersburg | No taxes paid/withheld Fraudulent number of workers petitioned Invalid employer/work site False statement re efforts to recruit workers | 12/07/07 |

(All in violation of Title 18, United States Code, Sections 1546(a) and 2.)

## Count Twelve

72

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about November 14, 2008, in the Eastern District of Virginia and elsewhere, defendant KATSIARYNA KUKHARCHUK, aided and abetted by defendant DZMITRY KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully cause the subscription of, false statements with respect to a material fact in the Application for Asylum and Withholding of Removal, Form I-589, including affidavits and  supporting statements, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and aided and abetted and wilfully cause the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: defendant KATSIARYNA KUKHARCHUK filed with the United States Department of Justice Executive office for Immigration Review "Respondent's Exhibits in Support of Asylum Application" purporting to be three letters with translation from friends of respondent in Belarus, when in truth and in fact defendant KATSIARYNA KUKHARCHUK prepared the letters herself and asked defendant DZMITRY KRASAUTSAU to translate the letters into English, which he in fact did.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

## Count Thirteen

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 25, 2008, in the Eastern District of Virginia and elsewhere, defendant POLINA KULESH, aided and abetted by defendant DZMITRY KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of false statements with respect to a material fact in the Change in Nonimmigrant Status, Form I-539, including a letter and bank statement, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: defendant POLINA KULESH filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a B2 tourist visa so she could remain in the United States for tourism, and a bank account statement showing she currently had on deposit $3,465.54 as a means of supporting herself in the United States when, in truth in fact, DZMITRY KRASAUTSAUK prepared the paperwork and POLINA KULESH had specifically applied for the tourist visa so POLINA KULESH could continue to work in the United States illegally and DZMITRY KRASAUTSAUK instructed POLINA KULESH to put up to $3,000 in her bank account temporarily to influence USCIS's determination to approve the change in status.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

## Count Fourteen

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 25, 2008, in the Eastern District of Virginia and elsewhere, defendant ANASTASSIYA NAGIBINA, aided and abetted by defendant DZMITRY

KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of, false statements with respect to a material fact in the Change in Nonimmigrant Status, Form I-539, including a letter and bank statement, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: defendant ANASTASSIYA NAGIBINA filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a B2 tourist visa so she could remain in the United States for tourism, and a bank account statement showing she currently had on deposit $3,107.03 as a means of supporting herself in the United States, when in truth in fact, DZMITRY KRASAUTSAU prepared the paperwork and NAGIBINA had specifically applied for the tourist visa so NAGIBINA could continue to work in the United States illegally and DZMITRY KRASAUTSAU instructed NAGIBINA to put up to $3,000 in her bank account temporarily to influence USCIS's determination to approve the change in status.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

### Count Fifteen

1.   The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.     On or about August 11, 2008, in the Eastern District of Virginia and elsewhere, defendant JANA MIZAKOVA,  aided and abetted by defendant DZMITRY KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of, false statements with respect to a material fact in the Change in Nonimmigrant Status, Form

I-539, including a letter and bank statement, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: defendant JANA MIZAKOVA filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a B2 tourist visa so she could remain in the United States for tourism and a bank account statement showing she currently had on deposit $7,349.93 as a means of supporting herself in the United States, when in truth in fact, DZMITRY KRASAUTSAU prepared the paperwork and JANA MIZAKOVA had specifically applied for the tourist visa so JANA MIZAKOVA could continue to work in the United States illegally and DZMITRY KRASAUTSAU instructed JANA MIZAKOVA to put up to $3,000 in her bank account temporarily to influence USCIS's determination to approve the change in status.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

## Count Sixteen

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 25, 2008, in the Eastern District of Virginia and elsewhere, an unindicted co-conspirator (O.K.) aided and abetted by defendant DZMITRY KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of, false statements with respect to a material fact in the Change in Nonimmigrant Status, Form I-539, including a letter and bank statement, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation

of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: O.K. filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a B2 tourist visa so she could stay in the United States for tourism and a bank account statement showing she currently had on deposit $3,099.09 as a means of supporting herself in the United States, when in truth in fact, DZMITRY KRASAUTSAU prepared the paperwork and had specifically applied for the tourist visa so O.K. could continue to work in the United States illegally and DZMITRY KRASAUTSAU instructed O.K. to put up to $3,000 in her bank account temporarily to influence USCIS's determination to approve the change in status.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

## Count Seventeen

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about September 29, 2008, in the Eastern District of Virginia and elsewhere, defendant INNA PALKOVA,  aided and abetted by defendant DZMITRY KRASAUTSAU under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of, false statements with respect to a material fact in the Change in Nonimmigrant Status, Form I-539, including a letter and bank statement, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: defendant INNA PALKOVA filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a B2 tourist visa so she could remain in the United States for

tourism, when in truth in fact, DZMITRY KRASAUTSAU prepared the paperwork and INNA

PALKOVA had specifically applied for the tourist visa so INNA PALKOVA could continue to

work in the United States illegally.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

**Count Eighteen**

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 27, 2008 in the Eastern District of Virginia and elsewhere, un indicted co-conspirator E.S.,  aided and abetted by defendant DZMITRY KRASAUTSAU and PATRICIA POCHTARUK under penalty of perjury, knowingly subscribed as true, and willfully caused the subscription of, false statements with respect to a material fact in the Change in Nonimmigrant Status, Form I-539, including a letter and affidavit of financial support by DZMITRY KRASAUTSAU, which application was required by the immigration laws and regulations prescribed thereunder, and presented, and wilfully caused the presentation of, such application which contained such false statements and which failed to contain any reasonable basis in law and fact, to wit: E. S. filed with the United States Citizenship and Immigration Services a letter stating she wished to change her expiring J1 student exchange visa status to a F1 student visa so she could stay in the United States to study English as a second language and asserted on her I-539 that no one included in the application had been arrested or convicted of any criminal offense since entering the United States, when in truth in fact,  DZMITRY KRASAUTSAU and PATRICIA POCHTARUK prepared the paperwork and  E. S. had  specifically applied for the student visa so  E. S. could continue to work in the United States illegally and DZMITRY KRASAUTSAU , who supplied the affidavit of financial support included in the application, has been arrested and convicted since he last entered the United States.

(In violation of Title 18, United States Code, Sections 1546(a) and 2.)

**Count Nineteen**

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 30, 2004, in Virginia Beach, Virginia, in the Eastern District of Virginia, defendants MARYIA HALUSHKINA and RYAN CURTIS BULKLEY, knowingly and unlawfully entered into a marriage for the purpose of allowing MARYIA HALUSHKINA to evade the provisions of the immigration laws of the United States.

(In violation of Title 8, United States Code, Section 1325(c) and Title 18, United States Code, Section 2.)

**Count Twenty**

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about June 17, 2005, in Virginia Beach, Virginia, in the Eastern District of Virginia, defendant VIKTAR KRUS knowingly and unlawfully aided and abetted Maryia Halushkina and Ryan Curtis Bulkley's entry into a marriage for the purpose of allowing Maryia Halushkina to evade the provisions of the immigration laws of the United States by submitting an I-864, Affidavit of Support Under Section 213A.

(In violation of Title 8, United States Code, Section 1325(c) and Title 18, United States Code, Section 2.)

**<u>Count Twenty-One</u>**

1.   The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.   On or about July 30, 2005, in Virginia Beach, Virginia, in the Eastern District of Virginia, defendant VIKTORIJA CUDNOVSKA, a/k/a "Victoria Webb,"  knowingly and unlawfully aided and abetted Maryia Halushkina and Ryan Curtis Bulkley's entry into a marriage for the purpose of allowing Maryia Halushkina to evade the provisions of the immigration laws of the United States by submitting an I-864, Affidavit of Support Under Section 213A.

 (In violation of Title 8, United States Code, Section 1325(c) and Title 18, United States Code, Section 2.)

**<u>Count Twenty-Two</u>**

1.   The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.   On or about November 4, 2004, in Virginia Beach, Virginia, in the Eastern District of Virginia, defendant KSENIA STEKOLSTSIKOVA,  knowingly and unlawfully entered into a marriage for the purpose of allowing KSENIA STEKOLSTSIKOVA  to evade the provisions of the immigration laws of the United States.

 (In violation of Title 8, United States Code, Section 1325(c) and Title 18, United States Code, Section 2.)

**Count Twenty-Three**

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about April 9, 2004, in Virginia Beach, Virginia, in the Eastern District of Virginia and elsewhere, defendant CHARLES BOND aided an abetted by JEKATERINA CEREDNICENKO, did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that defendant CHARLES BOND  declared on a Form I-130, Petition for Alien Relative, that JEKATERINA CEREDNICENKO's current address was 4595 Greenlaw Drive, Virginia Beach, Virginia, when the defendants then and there well knew JEKATERINA CEREDNICENKO did not reside at ███████████████ Virginia Beach, Virginia.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

**Count Twenty-Four**

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about April 9, 2004, in Virginia Beach, Virginia, in the Eastern District of Virginia and elsewhere, defendant JEKATERINA CEREDNICENKO, did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that defendant JEKATERINA CEREDNICENKO declared on a Form I-485, Application to Register

Permanent Resident or Adjust Status, that her current address was ████████████

Virginia Beach, Virginia, when the defendant then and there well knew she did not reside at

████████████ Virginia Beach, Virginia.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

## Count Twenty-Five

1.  The allegations contained in paragraphs one through forty-five of this indictment

entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth

within.

2.  On or about August 1, 2007,  in Norfolk, Virginia, in the Eastern District of Virginia,

defendant JEKATERINA CEREDNICENKO did knowingly make false statements under oath,

in a case, proceeding and matter related to, and under, and by virtue of a law of the United States

relating to naturalization, citizenship, and registry of aliens, in that:

3.  During the USCIS hearing, the defendant appeared a witnesses and was asked by a

district adjudications officer does anyone else live with you at ████████████ Virginia

Beach, Virginia.

4.  In response to the aforesaid question, the defendant stated under oath that she lived

with Lena, "She is not there now but she pays rent, come and go," or words to that effect.

5.  The aforesaid statements of the defendant was false, as she then and there well knew

that she actually lived at ████████ Virginia Beach with VIKTAR KRUS and not ████

████████ Virginia Beach, Virginia.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

**Count Twenty-Six**

1. The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2. On or about August 1, 2007, in Norfolk, Virginia, in the Eastern District of Virginia, defendant JEKATERINA CEREDNICENKO did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that:

3. During the USCIS hearing, the defendant appeared a witnesses and was asked by a district adjudications officer do you have plans to travel by yourself or as a couple anytime soon during the rest of the year?

4. In response to the aforesaid question, the defendant stated under oath, "No, anytime soon.  No plans," or words to that effect.

5. The aforesaid statements of the defendant was false, as she then and there well knew that she had purchased plane tickets to Europe where she was going to travel with Viktar Krus.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

**Count Twenty-Seven**

1. The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2. On or about August 1, 2007,  in Norfolk, Virginia, in the Eastern District of Virginia, defendant JEKATERINA CEREDNICENKO did knowingly make false statements under oath,

in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that:

3.  During the USCIS hearing, the defendant appeared a witnesses and was asked by a district adjudications officer who is your direct supervisor?

4.  In response to the aforesaid question, the defendant stated under oath, "Simon and Peter, I don't know their last names."

5.  The aforesaid statements of the defendant was false, as she then and there well knew that her supervisors were Dzmitry Krasautsau and Viktar Krus.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

### Count Twenty-Eight

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 1, 2007 in Norfolk, Virginia, in the Eastern District of Virginia, defendant CHARLES BOND did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that:

3.  During the USCIS hearing, the defendant appeared a witness and was asked by a district adjudications officer where are you currently living?

4.  In response to the aforesaid question, the defendant stated under oath, "███████ ████Virginia Beach, Virginia."

5.  The aforesaid statement of the defendant was false, as he then and there well knew that he did not live at ███████████████ Virginia Beach, Virginia, but rather at ███████ ████████████, Virginia Beach, Virginia.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

## Count Twenty-Nine

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 1, 2007 in Norfolk, Virginia, in the Eastern District of Virginia, defendant CHARLES BOND did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that:

3.  During the USCIS hearing, the defendant appeared a witness and was asked by a district adjudications officer who is your spouses direct supervisor?

4.  In response to the aforesaid question, the defendant stated under oath he did not know.

5.  The aforesaid statement of the defendant was false, as he then and there well knew that Jekaterina Cerednicenko's supervisor was Viktar Krus.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

### Count Thirty

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about November 22, 2004, in Virginia Beach, Virginia, in the Eastern District of Virginia and elsewhere, defendant RYAN BULKLEY aided an abetted by MARYIA HALUSHKINA, did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that defendant RB  declared on a Form I-130, Petition for Alien Relative, that his current address was ███████████████Virginia Beach Virginia, when the defendants then and there well knew RB did not reside at ████ ███████████████Virginia Beach Virginia.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

### Count Thirty-One

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about August 18, 2007 in Norfolk, Virginia, in the Eastern District of Virginia, defendant MARYIA HALUSHKINA did knowingly make false statements under oath, in a case, proceeding and matter related to, and under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, in that:

3.  During the USCIS hearing, the defendant appeared as a witness and was asked by a district adjudications officer when was the last time you had sexual intercourse?

4.  In response to the aforesaid question, the defendant stated under oath, last Wednesday."

5.  The aforesaid statement of the defendant was false, as she then and there well knew that she had never had sexual intercourse with Ryan Bulkley.

(In violation of Title 18, United States Code, Sections 1015(a) and 2.)

## Count Thirty-Two

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about March 5, 2007 in the Eastern District of Virginia, defendant OTIS MARTIN did knowingly falsify a document with the intent to impede, obstruct, and influence the proper administration of any matter within the jurisdiction of any department or agency of the United States: to wit defendant OTIS MARTIN did knowingly falsify a sworn affidavit which was submitted to an adjudicator of the United States Citizenship and Immigration Services within the Department of Homeland Security for the purpose of improperly influencing a determination of an I-130 Petition for Alien Relative.

(In violation of Title 18, United States Code, Section 1519).

## Count Thirty-Three

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about November 14, 2008, in the Eastern District of Virginia, defendant KATSIARYNA KUKHARCHUK did knowingly falsify a document with the intent to impede,

88

obstruct, and influence the proper administration of any matter within the jurisdiction of any department or agency of the United States: to wit defendant KATSIARYNA KUKHARCHUK did knowingly submit false documents of support to the United States Department of Justice Executive office for Immigration Review for the purpose of improperly influencing a determination of an I-589, Application for Asylum and Withholding of Removal.

(In violation of Title 18, United States Code, Section 1519).

### Count Thirty-Four

1. The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2. In or about March, 2007 in the Eastern District of Virginia, defendant VIKTORIJA CUDNOVSKA, a/k/a "Victoria Webb," did knowingly falsify a document with the intent to impede, obstruct, and influence the proper administration of any matter within the jurisdiction of any department or agency of the United States: to wit defendant  VIKTORIJA CUDNOVSKA, a/k/a "Victoria Webb,"  did knowingly falsify a sworn affidavit which was submitted to an adjudicator of the United States Citizenship and Immigration Services within the Department of Homeland Security for the purpose of improperly influencing a determination of an I-130 Petition for Alien Relative.

(In violation of Title 18, United States Code, Section 1519).

## Counts Thirty-Five Through Fifty-One

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  Beginning on or about the dates listed below and continuing through the date of this indictment, in the Eastern District of Virginia,  the defendants listed in the counts below, did encourage and induce certain aliens identified in counts thirty-five through fifty-one to come to, enter and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence in the United States was in violation of law.

| COUNT | DEFENDANTS | ALIEN | DATE OF INDUCEMENT |
|---|---|---|---|
| 35 | VIKTAR KRUS | **Gabor Teglasi** | 07/07/06 |
| 36 | DZMITRY KRASAUTSAU VIKTAR KRUS | **Janos TAMAS** | 09/02/08 |
| 37 | DZMITRY KRASAUTSAU GABOR TEGLASI VIKTAR KRUS | R.K. | 08/25/08 |
| 38 | DZMITRY KRASAUTSAU  MARYIA HALUSHKINA  PIOTR BARAVIK  GABOR TEGLASI | SB | 09/26/08 |
| 39 | DZMITRY KRASAUTSAU OTIS MARTIN GABOR TEGLASI | AF | 09/18/08 |
| 40 | DZMITRY KRASAUTSAU OTIS MARTIN VIKTAR KRUS | AA | 10/18/08 |
| 41 | DZMITRY KRASAUTSAU VIKTAR KRUS OTIS MARTIN JEKATERINA CEREDNICENKO MARYIA HALUSHKINA | SP | 09/29/08 |

| 42 | DZMITRY KRASAUTSAU<br>OTIS MARTIN<br>VIKTAR KRUS | AN | 10/18/08 |
|----|---|---|---|
| 43 | DZMITRY KRASAUTSAU | SI | 10/06/08 |
| 44 | DZMITRY KRASAUTSAU | **Anastassiya Nagibina** | 08/25/08 |
| 45 | DZMITRY KRASAUTSAU | **Polina Kulesh** | 08/25/08 |
| 46 | DZMITRY KRASAUTSAU | **Jana Mizakova** | 08/15/08 |
| 47 | DZMITRY KRASAUTSAU | ES | 08/20/08 |
| 48 | DZMITRY KRASAUTSAU | **Inna Palkova** | 09/29/08 |
| 49 | SHERYL BROWN<br>DZMITRY KRASAUTSAU<br>GABOR TEGLASI | RF | 08/25/08 |
| 50 | DZMITRY KRASAUTSAU<br>GABOR TEGLASI<br>MARYIA HALUSHKINA | VH | 09/03/08 |
| 51 | SHERYL BROWN<br>DZMITRY KRASAUTSAU | LH | 09/02/08 |

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and Title 18, United States Code, Section 2.)

## Counts Fifty-Two Through Sixty

1.  The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2.  On or about the dates and with the means of transport listed below, in the Eastern District of Virginia,  the defendants listed in the counts below, knowingly and in reckless disregard of the fact that the certain aliens identified in counts fifty-two through sixty-one herein had come, entered, and remained in the United States in violation of  law, did transport and move such aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, for the purpose of commercial advantage and private financial gain.

| COUNT | DEFENDANT | DATE | MEANS OF TRANSPORT | ALIEN TRANSPORTED |
|---|---|---|---|---|
| 52 | DZMITRY KRASAUTSAU | 04/03/08 | Truck | HT |
| 53 | GABOR TEGLASI | 04/04/08 | Truck | HT |
| 54 | GABOR TEGLASI | 04/10/08 | Truck | HT SG |
| 55 | GABOR TEGLASI | 07/25/08 | Truck | CL DF BP |
| 56 | DZMITRY KRASAUTSAU | 07/25/08 | Truck | RF |
| 57 | DZMITRY KRASAUTSAU | 08/28/08 | Truck | RF |
| 58 | DZMITRY KRASAUTSAU | 08/28/08 | Truck | RF |
| 59 | DZMITRY KRASAUTSAU | 08/28/08 | Truck | LH |
| 60 | DZMITRY KRASAUTSAU | 09/03/08 | Truck | VH |

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and Title 18, United States.)

## Counts Sixty-One Through Seventy-Four

1. The allegations contained in paragraphs one through forty-five of this indictment entitled "Introductory Allegations" are re-alleged and incorporated by reference as if set forth within.

2. On or about the dates and at the locations listed below, in the Eastern District of Virginia, the defendants listed in the counts below, knowing and in reckless disregard of the fact that certain aliens identified in counts below, had come to, entered, and remained in the United States in violation of law, did conceal, harbor and shield from detection such aliens in buildings and other places for the purpose of commercial advantage and private financial gain.

| COUNT | DEFENDANT | DATE | PLACE | ALIEN |
|-------|-----------|------|-------|-------|
| 61 | VAHE HARUTYUNYAN | 03/05/08 | Virginia Beach, VA | HT DW AH RPl CT |
| 62 | VIKTAR KRUS PIOTR BARAVIK | 04/03/08 | Virginia Beach, VA | HT |
| 63 | VAHE HARUTYUNYAN | 08/28/08 | Virginia Beach, VA | RF |
| 64 | DZMITRY KRASAUTSAU VIKTAR KRUS | 09/03/08 | Virginia Beach, VA | LH |
| 65 | VIKTAR KRUS KRASAUTSAU | 09/03/08 | Virginia Beach, VA | VH |

| 66 | GABOR TEGLASI | 09/08/08 | ███████████ Virginia Beach, VA | LR |
| 67 | DZMITRY KRASAUTSAU VIKTAR KRUS | 09/10/08 | ███████████ Virginia Beach, VA | MG |
| 68 | DZMITRY KRASAUTSAU VIKTAR KRUS | 09/11/08 | ███████████ Virginia Beach, VA | RW |
| 69 | DZMITRY KRASAUTSAU | 09/23/08 | ███████████ Virginia Beach, VA | RF |
| 70 | VIKTAR KRUS DZMITRY KRASAUTSAU | 10/16/08 | ██████████ Portsmouth, VA | LE |
| 71 | GABOR TEGLASI | 10/22/08 | ██████████ Portsmouth, VA | CW |
| 72 | PIOTR BARAVIK VIKTAR KRUS | 11/20/08 | ██████████ Virginia Beach, VA | INNA PALKOVA |
| 73 | VIKTAR KRUS | 12/01/08 | ██████████ Virginia Beach, VA | GABOR TEGLASI |
| 74 | VAHE HARUTYUNYAN | 12/11/08 | ██████████ Virginia Beach, VA | S P VZ OZ POLINA KULESH |

(In violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii) and Title 18, United States Code, Section 2.)

**Forfeiture Allegation**

Pursuant to Federal Rule of Criminal Procedure 32.2, the defendants  are advised that upon conviction of the offenses charged in Counts 1-11 and 35-74 of this indictment, they shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violations charged in Counts 1-11 and 35-74 and any that is used to facilitate or is intended to facilitate the commission of the offenses.

Property subject to forfeiture consists of, but it not limited to, the following:

1.  The sum of not less than $11,044,239.00  which represents any property real or personal that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense or that is used to facilitate, or is intended to be used to facilitate, the commission of the offense.

2.  All bank accounts and accounts receivable of Viktar Krus (also known as Victar Krus, Victor Krus, Viktor Krus, Victar Kruz, Victor Kruz, Victor Kruz, Viktar Kruz, and Viktor Kruz) and the entities: Valet Services, Inc. (also known as VS, Inc.); Household Management Group, Inc. (also known as HMG Services Inc.); Staff Supply Network, Inc.; V&K Services, Inc.; V&K Services trading as Viktar Krus; Staffing VS, Inc.; and Four Seasons Cleaning Service, Inc.

3.  All bank accounts and accounts receivable of Dzmitry Krasautsau (also known as Dzmitry Krasastau and Dmitry Krasastau) and the entities: Janitorial Solutions, Inc.; Business Consulting Services, Inc.; Quality Cleaning, Inc. (also known as QC, Inc.); Trans Auto Service, Inc. (also known as Trans Auto, Inc.); and Tidewater Personal Management, LLC.

4.  All bank accounts and accounts receivable of Vahe Harutyunyan and the entities: Labor Source, Inc.; NC International, Inc.; Catalyst Home Maintenance; Gulf Coast Resort Management;  Gulf Coast Resort Management Business Trust, Inc.; V&E Services; and Vahe Harutyunyan trading as V&E Service.

5.  All bank accounts in the name of Peter Baravik (also known as Piotr Baravik); Charles R. Bond; Jekaterina Cerednicenko; Viktorija U. Cudnovska;  Mariya Halushkina; Patricia Lidia Pochtaruk; Janos Tamas; Gabriel Teglasi (also known as Gabor Teglasi and Gebor Teglafi); and Dana Whitney.

6.  Real property located at ███████████████████ Virginia Beach, Virginia, owned by Vahe Harutyunyan.

7.  Personal property described as a 2004 Nissan Titan, VIN 1N6AA07B34N529134, owned by Dzmitry Krasautsau.

8.  Personal property described as a 2005 Nissan Titan, VIN 1N6BA07B25N569176, owned by Yemialyanau, Siarhei.

9.  Personal property described as a 2008 Nissan CCS, VIN 1N6AA07C68N305905, owned by Alena Bratsiankova.

10.  Personal property described as a 2004 BMW X3, VIN WBXPA93474WA61708, owned by Alena Bratsiankova.

11.  Personal property described as 2000 Chevy Van, VIN 1GAHG39R0Y1131378, owned by Valet Services.

12.   Personal property described as a 2000 Chevy Van, VIN 1GAHG39R4Y1133196, owned by Valet Services.

13.   Personal property described as a Chevy Van, VIN 1GAHG39U141168485, owned by Valet Services.

14.   Personal property described as a 2001 Chevy Van, VIN 1GAHG39U141168485, owned by Viktar Krus.

15.   Personal property described as a 1996 Dodge Dakota, VIN 1B7GG23XXTS685129, owned by Dzmitry Krasautsau.

16.   Personal property described as a 2005 Infinity SUV, VIN JNRAS08W35X212834, owned by Piotr Baravik.

17.   Personal property described as a 2004 Toyota Camry, VIN 4T1BE32K74U892252, owned by Dzmitry Krasautsau.

18.   Personal property described as a 1992 Celebrity Byr, Hull CLC13675D292, owned by Alena Bratsiankova.

19.   Personal property described as a 1995 Bombardier Byr, Hull ZZN85023E595, owned by Alena Bratsiankova.

20.   Personal property described as a 2008 Can-Am Spyder (3 wheeled motorcycle), VIN 2BXJAUA198V000507 owned by Viktar Krus.

21.    Personal property described as a 2008 Tahoe Byr, Hull BUJC81TWH708, owned by Lorant Zsombori.

22.  If property subject to forfeiture meets the requirements of 21 U.S.C. §853(p), the government will seek an order forfeiting substitute assets.

(In accordance with 8 U.S.C. § 1324(b); 18 U.S.C. § 981(d) and 28 U.S.C. § 2461(c); and 18 U.S.C. §§ 982(a)(6)(A) and (B)).

United States v. Piotr Baravik, et al.
Criminal No. 2:09cr


A TRUE BILL:


_____

FOREPERSON


DANA J. BOENTE
ACTING UNITED STATES ATTORNEY


By:   _____
      Joseph E. DePadilla
      Assistant United States Attorney
      Attorney for the United States
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, Virginia 23510
      Office Number (757) 441-6331
      Facsimile Number (757) 441-6689
      E-Mail Address - joe.depadilla@usdoj.gov


By:   _____
      Stephen W. Haynie
      Assistant United States Attorney
      Attorney for the United States
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, VA 23510
      Office Number (757) 441-6331
      Facsimile Number (757) 441-6689
      E-Mail address – steve.haynie@usdoj.gov